Filed 6/12/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B280966 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA432637) |
| v. | |
| TROY T. McVEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Douglas W. Sortino and Henry J. Hall, Judges. Affirmed.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell and Scott A. Taryle, Supervising Deputy Attorneys General, and Gregory B. Wagner, Deputy Attorney General, for Plaintiff and Respondent.

———————————————

Troy T. McVey appeals the judgment entered following three jury trials in which he was convicted of voluntary manslaughter (Pen. Code, § 192, subd. (a)) in count 1, and felony vandalism (Pen. Code, § 594, subd. (a)) in count 2.[1] The jury found true the personal firearm use allegation. (Pen. Code, § 12022.5, subd. (a).) The trial court imposed an aggregate sentence of 16 years 8 months, consisting of the mid-term of 6 years for the voluntary manslaughter conviction, plus 10 years for the firearm enhancement, and a consecutive 8-month term for the felony vandalism conviction.

Appellant contends the trial court erroneously excluded evidence that the victim had been diagnosed with paranoid schizophrenia and had behaved aggressively in two confrontations with police officers 20 years earlier in Florida. We disagree and affirm the judgment of conviction. Appellant further seeks remand for reconsideration of his firearm enhancement pursuant to Senate Bill No. 620,[2] which amended Penal Code section 12022.5, subdivision (c) to remove the

---

[1] Appellant was charged in count 1 with first degree murder, but the jury in the first trial reached a verdict only on count 2 while deadlocking on count 1. In a retrial of count 1, the jury found appellant not guilty of first and second degree murder, but guilty of voluntary manslaughter. Following the verdict, the trial court granted a motion for a new trial on the ground that the prosecution's late disclosure of evidence had prejudiced appellant in the second trial. A third trial on count 1 along with the verdict on count 2 from the first trial resulted in the judgment and sentence appellant now appeals.

[2] Senate Bill No. 620 (2017–2018 Reg. Sess.) Statutes 2017, chapter 682, section 1.

prohibition on striking firearm enhancements. Because the trial court's comments at sentencing unequivocally indicate that it would not exercise its new discretion under Penal Code section 12022.5, subdivision (c) to dismiss the firearm enhancement in appellant's case, we decline his remand request.

## FACTUAL BACKGROUND

In the late night hours of January 4, 2015, appellant and his friend, Coby, were walking on Cahuenga Boulevard in Hollywood. Appellant was carrying a semiautomatic .22-caliber handgun in his waistband behind his back. The magazine was fully loaded and there was a round in the chamber; the gun was cocked, and the safety was off. Outside an adult bookstore appellant and Coby were approached by two African-American men, who sold appellant what he believed to be cocaine for $40. Appellant and Coby crossed the street as the drug dealers drove away. When appellant and Coby examined the drugs they had just bought, appellant was upset to discover the substance was not cocaine, but powdered sugar.

The two men went to their car and changed clothes. They then returned to the area where the drug deal had taken place, and appellant saw what he thought was the car belonging to the drug dealers. Still upset about the fake drugs, he smashed all of the car's windows with the handle of a knife he was carrying. When an onlooker yelled at them, appellant stopped breaking the windows, and he and Coby walked away.

About a block away, appellant and Coby encountered a homeless man named Richard Miller, who was panhandling. Miller extended his hand toward appellant and asked for money.

An altercation ensued,[3] and appellant fired a shot at Miller. After a few seconds, appellant fired multiple shots in rapid succession. Miller collapsed on the sidewalk, and appellant walked away. Miller suffered a total of seven gunshot wounds, two of which were fatal.

Appellant and Miller stood between four and ten feet away from each other when appellant fired on Miller. According to seven eyewitnesses, Miller had made no aggressive moves toward appellant or threatened him before appellant fired his gun, but one witness reported seeing some pushing and shoving. None of the witnesses saw any weapon in Miller's hands or in the area where he fell, nor did police find a weapon of any kind on or around Miller.

Appellant testified that Miller approached him from behind, gesturing with his palm up and asking for money. Appellant felt Miller was pushing him toward a wall. Looking over his shoulder, appellant saw Miller reach into his pocket, and appellant took out his gun. Still with his back to Miller, appellant fired a warning shot into the ground. Appellant then turned around to face Miller, who had balled his hands into fists. The men were about six to eight feet apart. Appellant told Miller to get away, but Miller ignored him. Appellant noticed a knife in Miller's right hand and shot Miller in the right leg out of fear. But the shot appeared to have no effect, and Miller continued to

_____

[3] Three eyewitnesses heard appellant say to Miller, "Give me back my money," but one eyewitness testified that it was Miller who demanded money from appellant. Another eyewitness observed some pushing and shoving but could not hear what the men were saying.

4

advance. Appellant fired another shot at Miller's other leg to make him fall, but Miller lunged at appellant, leaving appellant no choice but to aim higher and fire again. Appellant shot Miller three more times before walking away.

**DISCUSSION**

I. **The Trial Court Properly Excluded Medical Records and Police Reports Pertaining to the Victim, as Well as the Defense Expert's Testimony Based on Those Records**

A. *Procedural history*

1. *The motion for a new trial*

Following appellant's conviction for voluntary manslaughter in the second trial, appellant moved for a new trial. The basis for the motion was the prosecution's delay until the end of trial in turning over evidence that Miller may have suffered from bipolar disorder or schizophrenia. (*Brady v. Maryland* (1963) 373 U.S. 83, 87.) Attached as exhibits to the motion were Miller's medical records and two police reports from Florida.

The medical records contained observations of Miller between August and November 1995, while he was housed in Pinellas County jail. The observations included descriptions of Miller as "psychotic," "delusional," and "paranoid," and documented "very bizarre behavior," including urinating and smearing feces on the walls. Doctors diagnosed Miller with paranoid schizophrenia, and on November 14, 1995, he was transferred to Florida State Hospital in Chattahoochee, Florida, after a Pinellas County court found him incompetent to stand trial. The medical records included a California subpoena directed to the custodian of records for the Pinellas County Sheriff's Office. In support of the new trial motion, defense

5

counsel also submitted a declaration with two additional exhibits which included doctors' reports from Miller's stay at Florida State Hospital from 1995 to 1997.

One of the police reports was from the Tarpon Springs Police Department. It described an encounter with police on July 27, 1995, in which Miller put his hand in his pocket and told officers to shoot him. Miller threw something at police and struggled violently as an officer attempted to conduct a pat-down search. After two officers subdued him, Miller was arrested on suspicion of resisting arrest with violence. The second police report, titled, "Fort Lauderdale Police Department: Offense Incident Report," described an incident on May 21, 1998, in which Miller reacted violently to officers who had awoken him when they found him sleeping on the beach. Miller resisted arrest, and police used pepper spray to bring him into custody.

At the hearing on the motion for a new trial, the defense psychiatric expert, Dr. Stephen Wilson, testified that the Florida medical records and police reports showed Miller had been found incompetent four times between 1995 and 1996, and the prevailing diagnosis across all the medical records was that Miller suffered from schizophrenia. He stated that a person suffering from schizophrenia typically hears imaginary voices and displays aggressive behavior. Dr. Wilson explained that schizophrenia is a lifelong illness that can be controlled with medication, but never cured. The medical records described Miller's behavior "as hostile, arrogant and delusional" throughout his commitment, but there was no indication that Miller acted out violently in the psychology ward or the state hospital. The police reports told a slightly different story, showing Miller behaving aggressively on two occasions in contacts with police.

Dr. Wilson opined that Miller's behavior in 2015 would likely be consistent with the behavior he exhibited in 1995 as documented in the medical records and police reports. However, the doctor acknowledged that it is not possible to predict behavior on a particular night in 2015 based on 20-year-old documents.

The trial court (Judge Douglas W. Sortino) granted the new trial motion based on newly discovered evidence. In light of the jury's acquittal on first and second degree murder, Judge Sortino found that the jury must have accepted the defense to some extent, and concluded that "this additional information . . . could have, likely might have, resulted in a different verdict at trial."

2. *The trial court's ruling on the admissibility of evidence of Miller's mental illness and criminal history*

Prior to the third trial, the prosecution sought to exclude the medical records, police reports, and any testimony by the defense expert based on those documents. The court (Judge Henry J. Hall) reviewed Dr. Wilson's testimony from the new trial motion along with the medical records and police reports. The court found the police reports were inadmissible hearsay under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). Noting the absence of any declaration or affidavit pursuant to Evidence Code section 1561[4] that would qualify the medical records under the business records exception, the court ruled the medical records inadmissible under *Sanchez* because they contained multiple layers of hearsay and did not fit under any hearsay exception.

---

[4] Undesignated statutory references are to the Evidence Code.

The court further declared that the defense expert could not testify about the medical records.

During trial, defense counsel revisited the admissibility of the medical records.  He advised the court that he had been unable to obtain a certification of the records because they had been purged from the hospital's records and the medical facility where Miller was treated had since closed.  Nevertheless, "in light of the totality of the circumstances," which included Judge Sortino's ruling on the new trial motion, counsel asked the court to apply the pre-*Sanchez* rules for expert testimony and allow the expert to testify about Miller's mental illness based on the contents of the medical records.

Finding the medical records to be case-specific hearsay, Judge Hall held the documents inadmissible under *Sanchez*.  Judge Hall added that he had strong reservations about the records' reliability and would likely have excluded them even under the pre-*Sanchez* rules.  The court reaffirmed its previous ruling prohibiting Dr. Wilson from relying on the medical records under section 802.[5]

**B. *Judge Sortino's ruling granting the motion for a new trial had no bearing on the issue of whether the documents were admissible.***

Appellant argues that in granting the new trial motion, Judge Sortino *implicitly* found "the defense could introduce the evidence of mental illness and aggression at the third trial."

---

[5] Under section 802, a court in its discretion may prohibit an expert from relying on case-specific hearsay to support her trial testimony.  (See *People v. Williams* (2016) 1 Cal.5th 1166, 1200.)

Appellant is incorrect.  The sole issue before the court in ruling on the new trial motion was whether the late disclosure of medical records and police reports prejudiced appellant by preventing him from fully investigating potentially material facts.  The court's decision on this issue was wholly separate from the question of whether particular records would be admissible in another trial.  Indeed, as Judge Hall observed, there was nothing in the record of the new trial hearing "to suggest that Judge Sortino was making findings about the admissibility of these documents."

Furthermore, even if Judge Sortino had made findings about the admissibility of the medical records and police reports, those evidentiary rulings would not have been binding on Judge Sortino himself or any other judge in a subsequent trial, for the trial "judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." (*Luce v. United States* (1984) 469 U.S. 38, 41–42; *Ohler v. United States* (2000) 529 U.S. 753, 758, fn. 3 ["*in limine* rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial"]; see *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1174; *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1096–1097, 1107.)

**C. *The medical records and police reports were inadmissible hearsay, and under* Sanchez, *the defense expert could not testify about the contents of those records and reports.***

*1. The business records hearsay exception*

Codified by section 1271, the business records exception to the hearsay rule permits admission of hearsay to prove an act, condition, or event if the following foundational requirements are met:  "(a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified

9

witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (§ 1271; *People v. Zavala* (2013) 216 Cal.App.4th 242, 246.) It is the burden of the party offering the evidence to establish that these foundational requirements have been met. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1011.) The trial court is vested with broad discretion to determine whether a party has laid a proper foundation for admission of records under section 1271, and the court's exercise of that discretion " 'will not be disturbed on appeal absent a showing of abuse.' " (*Zavala*, at pp. 245–246.)

Hospital records and similar documents are often admissible as business records, assuming a custodian of records or other duly qualified witness provides proper authentication to meet the foundational requirements of the hearsay exception. (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1280; *People v. Landau* (2016) 246 Cal.App.4th 850, 872, fn. 7.) Compliance with a subpoena duces tecum may dispense with the need for a live witness to establish the business records exception if the records are produced by the custodian or other qualified witness, together with the affidavit described in section 1561. (§ 1560, subd. (b); *In re R.R.*, at p. 1280; *In re Troy D.* (1989) 215 Cal.App.3d 889, 903.) As relevant here, the affidavit must include "[a] description of the mode of preparation of the records" and a statement to the effect that "[t]he affiant is the duly authorized custodian of the records or other qualified witness and has authority to certify the records" and "[t]he records were prepared by the personnel of the business in the ordinary course of business at or near the time of the act, condition, or event." (§ 1561, subd. (a)(1), (3), (5).)

The medical records appellant sought to introduce in this case were not authenticated in any way and plainly did not meet

the requirements for the business records exception. Defense counsel advised the trial court that the medical records had been destroyed by the Florida state hospital that had generated and maintained them, and counsel had obtained copies of the records pursuant to a subpoena directed to the Pinellas County Sheriff's Office in Florida. But defense counsel admitted that obtaining the requisite certification from the hospital would be impossible. And contrary to appellant's assertion, the mere fact that the medical records had been subpoenaed did not make them reliable or otherwise admissible as business records. (*People v. Blagg* (1968) 267 Cal.App.2d 598, 609–610 [in the absence of live testimony of a qualified witness, affidavit of an authenticating witness is required in order to lay a proper foundation for admissibility].)

The record on appeal in this case demonstrates that the sources of the medical records were third party entities which could supply no information about who prepared the documents, the circumstances and method of preparation, how the records were maintained by the hospital, or even whether the copies provided were the complete records. There being no proper foundation for the admission of the medical records under the business records exception to the hearsay rule, the trial court properly exercised its discretion in excluding the documents.

The police reports were similarly inadmissible. As a general rule, police reports do not fall under the business records exception. Our Supreme Court has explained: "Business records are defined as writings made in the regular course of business, at or near the time of the event, and created through sources of information and a method of preparation reflecting its trustworthiness. (§ 1271; see also § 1280 [record by public employee].) When a record is not made to facilitate business

11

operations but, instead, is primarily created for later use at trial, it does not qualify as a business record." (*Sanchez, supra*, 63 Cal.4th at p. 695, fn. 21; see *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 321 [certain documents kept in regular course of business—like police reports generated by law enforcement officials—not subject to business or official records hearsay exceptions because "the regularly conducted business activity is the production of evidence for use at trial"].)

In any event, the absence of any affidavit or live testimony from an authenticating witness in this case is fatal to appellant's claim that the police reports were admissible as business records. Because there is nothing about these documents to indicate any particular degree of trustworthiness, the trial court did not abuse its discretion in excluding them.

*2.* Sanchez

In *Sanchez*, our Supreme Court clarified the limits on the extent to which an expert witness can relate and rely upon hearsay in support of an opinion, based upon the distinction between " 'case-specific hearsay' " and hearsay which is "part of the 'general background information' acquired by the expert through out-of-court statements as part of the development of his or her expertise." (*People v. Stamps* (2016) 3 Cal.App.5th 988, 995 (*Stamps*); *Sanchez, supra*, 63 Cal.4th at pp. 678, 686.) *Sanchez* defined case-specific facts as "those relating to the particular events and participants alleged to have been involved in the case being tried," and held that an expert is prohibited from testifying to such facts if they are outside the expert's personal knowledge and do not fall under an exception to the hearsay rule or have not been independently established by competent evidence. (*Sanchez*, at pp. 676–677, 686.)

12

Traditionally, an expert's testimony concerning her general knowledge and background in her field of expertise, even if technically hearsay and offered for its truth, has not been subject to exclusion on hearsay grounds. (*Sanchez*, *supra*, 63 Cal.4th at pp. 676, 685.) But it falls to the trial court "to exclude expert testimony when necessary to prevent unreliable evidence and insupportable reasoning from coming before the jury." (*Stamps*, *supra*, 3 Cal.App.5th at p. 994; *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 753.) Thus, "[w]here general background hearsay is concerned, the expert may testify about it so long as it is reliable and of a type generally relied upon by experts in the field, again subject to the court's gatekeeping duty under *Sargon*." (*Stamps*, at p. 996; *Sanchez*, at pp. 676–679.)

*Sanchez* also explained that an "expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so." (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) However, "[i]t has long been the rule that an expert may not ' "under the guise of reasons [for an opinion] bring before the jury incompetent hearsay evidence." ' " (*Id*. at p. 679.) Thus, "[w]hat an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements" about which the expert has no independent knowledge and for which there is no independent competent evidence, unless a hearsay exception applies. (*Id*. at p. 686.) In addition, an underlying fact that has not been proven by independent admissible evidence may not be included in a hypothetical question posed to the expert. (*Id*. at pp. 677, 686; *Stamps*, *supra*, 3 Cal.App.5th at p. 996.) "Like any other hearsay evidence, [case-specific hearsay considered by an expert] must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an

13

appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Sanchez*, *supra*, 63 Cal.4th at p. 684, fn. omitted; *People v. Jeffrey G.* (2017) 13 Cal.App.5th 501, 510 (*Jeffrey G.*).)

Appellant maintains that *Sanchez* does not preclude expert testimony based on medical records and police reports showing Miller was schizophrenic and had been aggressive in contacts with Florida police 20 years earlier because "an expert may still rely on hearsay in forming an opinion and may tell the jury he did so in general terms, with a hypothetical including case specific facts." What appellant proposes is not simply informing the jury "in general terms" what the expert relied on, however. Rather, by appellant's reasoning, the exception would swallow the rule by allowing an expert to rely on case-specific hearsay under the fiction that it is not offered for its truth—precisely what *Sanchez* prohibits. As the high court explained, "There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception." (*Sanchez*, *supra*, 63 Cal.4th at p. 686.) The former properly allows the jury to evaluate the probative value of the expert's testimony, while the latter purports to transform otherwise inadmissible hearsay into competent evidence offered for its truth. (*Id.* at pp. 683, 686.) In short, *Sanchez* precluded the defense expert from relating to the jury the contents of the medical records and police reports pertaining to the victim in this case.

The trial court also properly excluded the defense expert's testimony based on the documents, for without disclosure of the contents of the records, any opinion the expert might have offered would have been irrelevant. As *Sanchez* recognized, "When an

14

expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth." (*Sanchez*, *supra*, 63 Cal.4th at p. 682.) Thus, the validity of the expert's opinion depends entirely on the truth of the hearsay: "If the underlying hearsay is not true, the opinion is rendered irrelevant to the case at hand." (*Jeffrey G.*, *supra*, 13 Cal.App.5th at p. 509; *Sanchez*, at pp. 682–683.)

## II. Remand Is Not Warranted for Reconsideration of the Firearm Enhancement

Appellant contends the case must be remanded for reconsideration of his firearm enhancement pursuant to Senate Bill No. 620, which gave trial courts discretion to strike firearm enhancements when the law became effective on January 1, 2018. Respondent concedes that the new legislation applies retroactively to cases in which judgment is not yet final on appeal. (See *In re Estrada* (1965) 63 Cal.2d 740, 748 [for a non-final conviction, "where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed"]; *People v. Francis* (1969) 71 Cal.2d 66, 75–78 [where statute enacted during pending appeal gave trial court discretion to impose a lesser penalty, remand was required for resentencing].) Nevertheless, the Attorney General maintains that remand in this case is inappropriate because the trial court's statements on the record affirmatively demonstrate that the trial court would not exercise its new discretion to strike appellant's firearm enhancement. We agree.

The People rely on *People v. Gutierrez* (1996) 48 Cal.App.4th 1894 (*Gutierrez*) to argue that no purpose would be

15

served by a remand in this case. In *Gutierrez*, the Court of Appeal declined remand to allow the trial court to exercise its new discretion under *Romero*[6] to strike a prior conviction under the "Three Strikes" law. The court held that *Romero* did not require remand where the sentencing court had unequivocally indicated that it would not have exercised its discretion to strike the Three Strikes prior even if it had believed it could have done so. (*Gutierrez*, at p. 1896.) Given that the trial court had properly exercised its sentencing discretion to impose the maximum term, the court concluded that "no purpose would be served in remanding for reconsideration." (*Ibid*.) Also in the *Romero* context, our Supreme Court has unambiguously held that "remand is not required where the trial court's comments indicate that even if it had authority to strike a prior felony conviction allegation, it would decline to do so." (*People v. Fuhrman* (1997) 16 Cal.4th 930, 944; *Romero*, *supra*, 13 Cal.4th at p. 530, fn. 13; see *People v. Gamble* (2008) 164 Cal.App.4th 891, 901 [if " 'the record shows that the trial court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required' "].)

Under Penal Code section 12022.5, subdivision (a), the trial court in this case had discretion to impose a 3-, 4-, or 10-year prison term for the firearm enhancement in count 1. In choosing the 10-year enhancement, the trial court identified several aggravating factors, including the lack of significant provocation, appellant's disposition for violence, his lack of any remorse, and his "callous reaction" after shooting an unarmed homeless man

---

[6] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

16

six or seven times.  These factors, the court said, far outweighed any mitigating factors.  The court also noted that appellant "did not hesitate to shoot this unarmed homeless guy" multiple times, and described appellant's attitude as "pretty haunting."  Thus, when it imposed the sentence enhancement under Penal Code section 12022.5, subdivision (a), the court declared, "[T]his is as aggravated as personal use of a firearm gets," and "the high term of 10 years on the enhancement is the only appropriate sentence on the enhancement."

In light of the trial court's express consideration of the factors in aggravation and mitigation, its pointed comments on the record, and its deliberate choice of the highest possible term for the firearm enhancement, there appears no possibility that, if the case were remanded, the trial court would exercise its discretion to strike the enhancement altogether.  We therefore conclude that remand in these circumstances would serve no purpose but to squander scarce judicial resources.  (*Fuhrman*, *supra*, 16 Cal.4th at p. 946; *Gutierrez*, *supra*, 48 Cal.App.4th at p. 1896; cf. *People v. McDaniels* (2018) 22 Cal.App.5th 420, 423 [remand proper where record contains no clear indication of trial court's intent not to strike firearm enhancement].)

**DISPOSITION**

The judgment is affirmed.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.