Filed 10/22/20  P. v. Robinson CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GREG ROBINSON,<br><br>Defendant and Appellant. | F077417<br><br>(Super. Ct. No. DF011748A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Craig Phillips, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Louis M. Vasquez, William K. Kim and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Greg Robinson cut the neck of David S.,[1] a fellow inmate at North Kern State Prison. He was convicted of attempted premeditated murder. (Pen. Code, §§ 664, 187, 189.[2]) The jury also found true enhancements for personal use of a deadly weapon (§ 12022, subd. (b)), and personal infliction of great bodily injury (§ 12022.7, subd. (a)). In bifurcated proceedings, the court found defendant had suffered four prior strikes (§ 1170.12), including two convictions that qualified for prior serious felony enhancements (§ 667, subd. (a)(1)), and had served three prior prison terms (§ 667.5, subd. (b)).[3] Defendant was sentenced to a term of 25 years to life, plus 16 years.

On appeal, defendant contends the trial court prejudicially erred in denying his motion for new trial, in which he alleged his trial counsel was ineffective for failing to present evidence of a prior statement by a defense witness that implicated someone else in the assault. He also contends the matter should be remanded for the trial court to consider whether to strike the two 5-year prior serious felony enhancements pursuant to Senate Bill No. 1393 (Stats. 2018, ch. 1013, §§ 1–2, pp. 1–6 (Senate Bill No. 1393 or Sen. Bill No. 1393)), to strike the two 1-year prior prison term enhancements pursuant to Senate Bill. No. 136 (Stats. 2019, ch. 590, § 1, pp. 1–4 (Senate Bill No. 136)), and to correct the abstract of judgment with respect to his presentence conduct credits.

We will remand for the court to consider whether to strike the prior serious felony enhancements. On remand, the court shall also strike the prior prison term enhancements and correct the abstract of judgment with respect to defendant's presentence credits. We otherwise reject defendant's arguments and affirm the judgment.

---

[1]    Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

[2]    Undesignated statutory references are to the Penal Code.

[3]    As discussed below, the court later declined to impose one of the prior prison term enhancements.

## FACTUAL BACKGROUND

David and defendant were inmates in the same dormitory-style housing unit at North Kern State Prison. On April 30, 2014, shortly before noon, David approached correctional officer O. Gonzalez with his hand on his neck and said, "'I've been cut.'" When David moved his hand, blood gushed down from the wound. Gonzalez asked what had happened, and David responded, "'It was that motherfucker Nobody in 80 up.'" Gonzalez and David both knew defendant by the moniker "Nobody"; Gonzalez understood "80 up" to refer to defendant's bunk location. Gonzalez showed David a picture board that displayed every inmate assigned to the housing unit. David pointed to a picture of defendant. David then yelled, in the direction of defendant's bunk, "'Yeah, I'm telling. You're going down for this, Robinson.'"

David received three absorbable sutures and five removable sutures for a "really deep cut," approximately four inches long, toward the front of his neck. He also had a shallow scratch along the right side of his neck and toward the back. The wounds appeared to have been caused by a single movement.

David testified that, on the date of the incident, he had known defendant for approximately one month.[4] Around the time they met, David said something derogatory about defendant in front of other inmates. Thereafter, there was tension between David and defendant, and they had exchanged "a few words." On the morning of the incident, David was pacing the housing unit while waiting to be transferred to another prison. He saw defendant to his left, sitting on defendant's top bunk, looking like he wanted to kill David. David saw defendant slide off his bunk and come up behind him, then felt a hand come around the front of his neck, followed by a stinging sensation. David put his hand to his neck. Defendant took off running past David, looking back at David as he ran.

---

[4] David testified that he had been twice convicted of possession of drugs for sale, as well as another crime of moral turpitude.

3.

David saw defendant throw something under one of the bunks. David acknowledged he could not see well out of his right eye but had good peripheral vision out of his left eye.

Inmate Joshua M. testified for the defense.[5] He was an inmate housed in the same facility as David and defendant at the time of the incident, and knew David to have a reputation for being mean and a bully. David was not well-liked. Joshua had witnessed David bullying a particular inmate with a mental health issue. A few inmates told David to stop bullying that person. Joshua knew defendant to be quiet and to keep to himself. He spoke with defendant a few times and he seemed to be a decent person. He was familiar with defendant's voice. He never saw defendant interact with David. On the date of the incident, Joshua heard David arguing with someone. A few minutes later, he saw David with his hand on his neck, talking with a correctional officer.

Defendant testified in his own defense.[6] Defendant testified he "had nothing against [David], but [he] had nothing for him either." However, he knew David to bully some of the mentally ill inmates, for whom defendant acted as a liaison with corrections staff. Defendant at some point thought of doing, and decided to do, something violent to David, but did not act on those thoughts.

Defendant testified that, when the incident occurred he was standing near the bunk of another inmate. David was standing by himself near his own bunk. Three inmates— "Ant," "Buffalo," and an inmate who went by the moniker "Puppet" or "Joker,"—were sitting at a table. When they stood up, Ant and Buffalo went in different directions. Puppet walked straight to David and brought his right arm up to David's neck. David grabbed his neck and Puppet walked away through some bunks. David stood there for

---

[5] Joshua testified generally that he had been convicted of several crimes of moral turpitude.

[6] Defendant testified generally that he had been convicted of multiple crimes of moral turpitude. After defendant opened the door to character evidence, he was cross-examined regarding the nature of those offenses, and testified that his convictions included two convictions for assault with a deadly weapon, and one conviction for lewd and lascivious acts on a child under the age of 14 years.

4.

approximately 40 seconds before he turned to look in defendant's direction. Blood was starting to come down David's neck. Defendant said, "'Man, that's got to hurt,'" which defendant described as a "smart-aleck comment." David then went to talk to a correctional officer. Defendant went to another inmate's bunk area.

Defendant denied cutting David. He opined that David implicated him in the offense because Puppet, Ant, and Buffalo were members of a prison gang that had members in every sensitive needs yard in the prison system. Defendant explained that David could not avoid this gang by transferring to another prison, because both he and David were sensitive needs yard inmates. However, defendant was a "Nobody" and there would be no consequences to David for implicating him.

Defendant acknowledged that, prior to the instant charges being filed, he told an investigator from the district attorney's office that he didn't know anything about the incident. He also acknowledged that he discussed the facts of this case during a phone call while he was in local custody, and therein stated "it was self-defense."

## DISCUSSION

### I.     Ineffective Assistance of Counsel

Defendant argues the trial court erred in denying his motion for new trial, which alleged his trial counsel was constitutionally ineffective for failing to introduce evidence of prior statements by defense witness Joshua M., who stated that he observed another inmate commit the assault. We conclude defendant has not demonstrated ineffective assistance of counsel.

#### A.     Applicable Law

Defendant bears the burden of demonstrating ineffective assistance of counsel. (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*).) "'[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing: that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been

5.

different were it not for the deficient performance.' [Citations.] Rarely is ineffective assistance of counsel established on appeal since the record usually sheds no light on counsel's reasons for action or inaction." (*People v. Woodruff* (2018) 5 Cal.5th 697, 736 (*Woodruff*).) In determining whether counsel's performance was deficient, we consider whether ""'"counsel's representation fell below an objective standard of reasonableness under prevailing professional norms .…'"'" (*People v. Johnson* (2016) 62 Cal.4th 600, 653.) However, we "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

Where the trial court has denied a motion for a new trial based on a claim of ineffective assistance of counsel, we apply the standard of review applicable to mixed questions of law and fact, upholding the trial court's factual findings to the extent they are supported by substantial evidence, but reviewing de novo the ultimate question of whether the facts demonstrate a violation of the right to effective counsel. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724–725; accord, *People v. Rodriguez* (2019) 38 Cal.App.5th 971, 977; see *People v. Hamilton* (2009) 45 Cal.4th 863, 923 ["The determination of whether a defendant received ineffective assistance of counsel is a legal one made by a reviewing court, not a factual one entrusted to a finder of fact."].)

## B. Additional Factual Background

As discussed above, Joshua M. testified as a defense witness. Relevant here, he testified that he heard David arguing with someone and, a couple of minutes later, saw David talking to an officer and holding his neck. He did not see defendant interacting with David. He was not asked, and did not testify, as to whether he saw anyone cut David's neck.

Following the jury's verdict, the court appointed new counsel to represent defendant for purposes of investigating and preparing a motion for new trial. Defendant's new counsel brought such a motion, asserting trial counsel was ineffective.

6.

Attached to the motion was a declaration from defense investigator B. Binns, stating that he interviewed Joshua at the request of an attorney who had represented defendant prior to trial.[7]  During the interview, Joshua stated that he observed an inmate named Botello, who he also knew by the moniker "'Harsh [A]ttitude[,]'" creep up behind David and reach around with an object, making a slashing motion.  Joshua also told Binns that defendant had nothing to do with the attack on David, but he was in the vicinity.  Binns wrote a report containing Joshua's statements,  which he provided to defendant's pretrial counsel and, eventually, to his trial counsel.  Trial counsel did not contact Binns regarding the statements.  Binns stated that he would have testified to these statements if called.  Defendant argued counsel was ineffective for failing to introduce these statements, and defendant was prejudiced thereby when he "was forced to testify[]" because an exculpatory account of the assault was not otherwise presented by defense counsel.

The court held a hearing on the motion for new trial, at which defendant testified. Defendant testified that Joshua told him he saw the incident and was willing to speak with defendant's attorney.  Defendant gave his attorney Joshua's information. Defendant's attorney told him that Joshua "had [seen] everything and was willing to testify."  According to defendant, pretrial defense counsel wanted Joshua to testify so that defendant would not have to testify.  However, this attorney was eventually relieved and new counsel was appointed for trial.  Defendant later informed trial counsel of Joshua's

---

**7** Defendant was dissatisfied with most, if not all, of the attorneys who represented him. He unsuccessfully sought to relieve the deputy public defender who represented him during the initial pretrial proceedings.  That attorney was later relieved due to a conflict, and an attorney from the Indigent Defense Program was appointed.  Binns reported to this second attorney. Subsequently, defendant successfully moved to relieve his second attorney,  and a different attorney from the Indigent Defense Program was appointed and represented him through trial. After trial, defendant moved to have his trial counsel relieved.  The court granted the motion solely for purposes of bringing a motion for new trial.  Once the motion for new trial was denied, defendant stated, "I don't want nothing to do with [trial counsel,]" and the matter proceeded to sentencing with the attorney who represented him on the motion for new trial.

statements and Binns's report, but counsel never discussed trial strategy or witnesses with defendant. Defendant did not understand why Joshua did not testify at trial regarding who committed the offense. Defendant asked trial counsel about Joshua's statement during trial, and trial counsel claimed he did not have it.

Defendant further testified that he was in a holding cell in the jail immediately before Joshua's trial testimony, and he saw Joshua in another cell with Botello, who Joshua had accused of being the perpetrator of the attack. According to defendant, Botello is a member of a prison gang, and he and Joshua were housed together for approximately one hour.[8] Defendant surmised Joshua was unwilling to testify against Botello due to this encounter.

Defendant testified that he would not have taken the stand if Joshua had testified that someone else committed the assault. Defendant claimed that he and trial counsel spoke for "a minute or two[]" regarding his decision to testify immediately before he took the stand: "[H]e told me that if I can go up there and just sway one jury [*sic*]. He kept telling me, 'I'm going to walk you out that door. I'm going to walk you out that door. Don't worry. Everything's okay.'" According to defendant, trial counsel told him that "if [he] can sway just one jury [*sic*], that [he's] going to go home." Defendant claimed that he was scared to testify and was having PTSD due to a lack of medication but, when he raised this with defense counsel, defense counsel told him, "'Save it for your memoirs.'"[9] Additionally, when he testified, his attorney did not ask the right questions to allow defendant to explain "why they went after [David] and … how it played out."

---

[8] On the morning of trial, the court noted on the record that "two witnesses from CDC who were brought here earlier this morning[]" had been housed together for approximately 15 to 20 minutes before being separated.

[9] During defendant's trial testimony, defense counsel told defendant he would "wait for [his] memoirs[,]" or to "leave that for your memoirs[,]" on two occasions when his answers were not responsive to the question posed.

Defendant testified that he also saw Botello commit the assault against David, and that his reference to "Puppet" or "Joker" at trial referred to Botello. However, he did not know Botello's actual "street name[,]" and did not want to say Botello's street name in open court at trial. Defendant believed doing so would have put himself and his family in jeopardy with the motorcycle club defendant belonged to, which required him to "take [his] lumps and catch [the perpetrator] in CDC and take his life." Moreover, defendant did not believe he would be convicted; otherwise, he would have revealed the name at trial.

The court generally found that defendant's testimony was not credible. With respect to trial counsel's alleged statement, "'He told me if I can only sway one juror, I could go home[,]'" the court stated:

> "First, that's not logically correct, legally correct, and not something I would expect any lawyer to say to any defendant. They might say, 'You can hang it and try to get a better deal.' But they're not going to tell him he can go home because obviously getting one juror to believe it doesn't make it an acquittal. And the idea that anybody, including [trial counsel], would have said that is specious."

With respect to defendant's claimed fear of giving Botello's name in open court, the court stated:

> "Then he's also not to give a name in open court of the person who did it. Well, he did. He testified in open court as to people who actually committed the crime. So his story about he can't do that because that would violate his code with the [motorcycle club] doesn't fly either because he, in fact, gave the name of somebody who he said did it. Just didn't happen to be the same person that [Joshua] said did it. That whole thing, in my mind, is—has no weight at all as far as any evidentiary value."

The court determined that the extent to which trial counsel chose to question Joshua was "a tactical choice." The court further noted that Joshua may not have testified consistently with his prior statement if questioned about it, and that he in any event would have been impeached based on the details of his prior criminal convictions. The court

9.

noted that it did not think trial counsel wanted defendant to testify, which had prompted the court to advise defendant on the record of his right not to testify and to take his waiver of that right on the record. Nonetheless, defendant "chose to get up and try to sell his story to the jury." The court continued:

> "In doing so, he opened the door to two different impeachment statements, both of which were contradictory to the one that they already had. And I find that that was undoubtedly the thing that was— had the— carried the greatest weight in the case.

> "Jury heard three different stories basically out of the mouth of the defendant about what happened and didn't find him to be very credible and undoubtedly reached the conclusion that he was lying about it because he did it. That's not necessarily true. Some people just lie to lie, but I'm sure that's the conclusion that they reached.…"

Accordingly, the court denied the motion for new trial.

**C.     Analysis**

As stated, to demonstrate ineffective assistance of counsel, defendant must establish both deficient performance and prejudice. (*Woodruff, supra,* 5 Cal.5th at p. 736.) We conclude he established neither.

Defendant argues trial counsel should have laid a foundation for Binns to testify, and should have called Binns to testify regarding Joshua's statements. The decision to call a particular witness is generally deemed a tactical decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 334.) A decision not to call a witness generally does not constitute reversible error unless it results from an unreasonable failure to investigate. (*Ibid.*) Here, as defendant concedes, there was no failure to investigate. The trial court found that defense counsel was aware of Joshua's prior statements, and defendant agrees that this finding was supported by substantial evidence.

Instead, defendant contends that counsel's failure to call Binns was unreasonable and that no reasonably competent attorney would have made such a decision. The record sheds no light on the reason for counsel's decision not to elicit testimony from either

10.

Joshua or Binns implicating Botello in the assault. (See *Woodruff, supra,* 5 Cal.5th at p. 736.) However, this is not a circumstance where we can imagine no rational or satisfactory explanation for defense counsel's inaction. (*People v. Arredondo* (2019) 8 Cal.5th 694, 711 (*Arredondo*) [reversal permitted "'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation[]'"].)

For example, we note that Joshua's testimony was favorable to defendant. In limited initial questioning, the only significant testimony counsel elicited was that Joshua didn't like David, that Joshua recognized defendant's voice, and that Joshua heard David arguing with someone else immediately before the assault. After defendant testified and opened the door to evidence of his and David's respective characters, Joshua testified that David had bullied other inmates and that defendant seemed quiet and decent and kept to himself. This testimony was relied on by defense counsel in closing argument.

In contrast, presenting evidence of Joshua's prior statements was not without risk. In this regard, we note that inmate Botello was brought to the courthouse for trial. Early in the trial, defense counsel sought to have him released as a witness, but the prosecutor stated Botello was needed until the case was over. It was not until both defendant and Joshua concluded their testimony that Botello was released. Botello likely would have been called as a witness had defense counsel elicited testimony implicating Botello in the assault. Reasonable defense counsel may have concluded that such testimony would undermine the credibility of the favorable testimony Joshua did provide. We therefore cannot say the choice not to pursue testimony regarding the prior statements had no conceivable tactical purpose. (See *Arredondo, supra,* 8 Cal.5th at p. 711.)

Moreover, even if we found counsel's performance deficient, we would find no prejudice. First, there is no reasonable probability the outcome of the case would have been more favorable to defendant had Joshua's prior statements been presented.

11.

(*Woodruff, supra,* 5 Cal.5th at p. 736.)  As noted by the trial court, Joshua's credibility likely would have been impeached with the details of his prior offenses, which otherwise were presented only generally as "crimes of moral turpitude."  Indeed, defendant does not argue that Joshua's statements themselves were likely to have swayed the jury.

Instead, defendant argues he was prejudiced because he himself testified as a result of counsel's decision.  There is no question that defendant's trial testimony was prejudicial to his defense.  Defendant was impeached with numerous prior convictions, including a conviction for a sexual offense.  He acknowledged previously being accused of telling a correctional officer he wanted to slit his cellmate's throat.  He also acknowledged his prison housing determination was, at one point, determined based on an accusation that he slit another inmate's throat.  And, he acknowledged that he had resolved to do something violent against David.  Notably, despite testifying that he saw someone named "Puppet" commit the instant offense, he admitted telling an investigator, prior to the filing of charges, that he had no knowledge of the incident.  He also admitted to a phone conversation in which he described the instant offense and suggested he may have acted in self-defense.  As the trial court found, this testimony undermined the credibility of defendant's version of events in which "Puppet" was the perpetrator.

However, the trial court did not find that defendant was motivated to take the stand by counsel's failure to present Joshua's prior statements.  At the hearing on the motion for new trial, defendant testified to at least two reasons he decided to take the stand.  One reason was counsel's failure to present Joshua's prior statements.  Another was that counsel encouraged defendant to testify on the premise that convincing a single juror would allow him to go home.  Although the court did not make a specific finding regarding the former reason, it concluded the latter reason "specious."  It also concluded defendant's testimony explaining why he did not previously name Botello as the perpetrator was not credible.

12.

The court noted defendant "chose to get up and try to sell his story to the jury," despite counsel not wanting him to do so. Notably, that story named a different perpetrator than the one Joshua allegedly identified. Defendant also indicated that he wished to tell the jury the story of "why they went after [David] and … how it played out." There is no suggestion from Binns's report that either Binns or Joshua would have, or could have, testified to such details. Thus, the record suggests defendant would have chosen to "try to sell his story to the jury" even if Joshua's prior statements were introduced, and particularly if those statements were impeached or undermined by testimony of other witnesses. On these facts, we cannot conclude counsel's decision was the but-for cause of defendant's testimony. (*Mickel, supra,* 2 Cal.5th at p. 198.) Defendant has not met his burden of demonstrating that he was prejudiced by counsel's inaction. (*Ibid*.)

Accordingly, defendant has not demonstrated ineffective assistance of counsel.

## II. Senate Bill No. 1393

The court found defendant had been convicted of two prior serious felony offenses (§ 667, subd. (a)(1)), and imposed a separate five-year prison term for each. Defendant contends the matter must be remanded for the trial court to consider whether to strike the prior serious felony enhancements pursuant to the discretion granted by Senate Bill No. 1393. The People concede Senate Bill No. 1393 applies retroactively to defendant's case, but contend remand for resentencing would be futile. We remand.

Effective January 1, 2019, Senate Bill No. 1393 amended sections 667, former subdivision (a)(1), and 1385, former subdivision (b), and granted trial courts the discretion to strike the previously mandatory five-year prior serious felony conviction enhancement under section 667, subdivision (a)(1). (Stats. 2018, ch. 1013, §§ 1–2, pp. 1– 6.) As the People concede, Senate Bill No. 1393 applies retroactively because defendant's case is not yet final. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 973

(*Garcia*) [Sen. Bill No. 1393 applies to all cases not yet final pursuant to *In re Estrada* (1965) 63 Cal.2d 740, 744–745].)

We nonetheless must consider whether the matter must be remanded for the court to consider whether to exercise its discretion to strike defendant's prior serious felony enhancements. "'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.'" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 (*Gutierrez*).) Following *Gutierrez*, most of the published cases considering whether to remand for the court to consider striking an enhancement under similar circumstances have concluded that remand is appropriate. (E.g., *People v. Johnson* (2019) 32 Cal.App.5th 26, 67–69 [Sen. Bills Nos. 1393 & 620[10]]; *Garcia, supra,* 28 Cal.App.5th at p. 973 [Sen. Bill No. 1393]; see *People v. Almanza* (2018) 24 Cal.App.5th 1104, 1109–1111 [Sen. Bill No. 620]; *People v. Billingsley* (2018) 22 Cal.App.5th 1076, 1081–1082 [Sen. Bill No. 620]; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425, 427–428 (*McDaniels*) [Sen. Bill No. 620].)

However, remand for resentencing is not required when "the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] enhancement." (*McDaniels, supra,* 22 Cal.App.5th at p. 425.) A minority of cases have found circumstances sufficient to foreclose remand. (E.g., *People v. Allison* (2019) 39 Cal.App.5th 688, 705–706 [remand under Sen. Bill

---

[10]    Statutes 2017, chapter 682, sections 1–2, pages 1–4 (Sen. Bill No. 620).

No. 620 unnecessary where trial court had already resentenced the defendant once on remand, and court and parties focused on determining the maximum lawful sentence with goal of coming as close as possible to 51-year sentence originally imposed]; *People v. Jones* (2019) 32 Cal.App.5th 267, 274 [remand unnecessary where record clear trial court would not exercise discretion to strike enhancement under Sen. Bill No. 1393]; *People v. McVey* (2018) 24 Cal.App.5th 405, 419 (*McVey*) [record clear trial court would not exercise discretion to strike enhancement under Sen. Bill No. 620].)  In such cases, remand "would serve no purpose but to squander scarce judicial resources."  (*McVey*, *supra*, at p. 419.)

Here, the People contend remand would be futile because the trial court declined to strike defendant's prior strike convictions pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, and it imposed the maximum possible sentence.  In so doing, the court noted only that defendant had not remained crime free for any significant period of time and there was no reason to support striking any of the prior strikes other than the age of some of them which, even if stricken, would not have affected the overall sentence.  This does not constitute a "clear" statement indicating the court would not have stricken any other enhancements, even if it had discretion to do so.  (*McDaniels, supra,* 22 Cal.App.5th at p. 427; cf. *McVey, supra,* 24 Cal.App.5th at p. 419 [declining to remand where the trial court described the defendant's conduct as "'pretty haunting[]'" and "'as aggravated as personal use of a firearm gets,'" and describing the upper term as "'the only appropriate sentence on the enhancement'"].)

Defendant is entitled to be sentenced in the exercise of the court's informed discretion.  At the time defendant was sentenced, the court lacked the discretion to strike or stay the prior serious felony enhancements.  In light of the absence of a record suggesting remand would be futile, we must remand to permit the trial court to exercise its discretion in the first instance.  (*Gutierrez, supra,* 58 Cal.4th at p. 1391.)  We express

no opinion on how the trial court should exercise its discretion on remand. (*McDaniels, supra,* 22 Cal.App.5th at p. 428.)

## III. Senate Bill No. 136

The trial court found defendant had suffered three prior felony convictions for which he served a prison term, and it imposed two 1-year sentencing enhancements.[11] (§ 667.5, former subd. (b)(1).) In supplemental briefing, defendant argues the court must be instructed to strike the prior prison term enhancements in light of Senate Bill No. 136.

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b), to make a one-year enhancement pursuant to that statute applicable only to a prior prison term for a sexually violent offense, as defined in Welfare and Institutions Code section 6600, subdivision (b). (See Stats. 2019, ch. 590, § 1, pp. 1–2.) The People concede defendant is entitled to the ameliorative benefit of this amendment. (*People v. Lara* (2019) 6 Cal.5th 1128, 1134 [a statutory amendment lessening punishment is presumed to apply in all cases not yet final as of the statute's effective date, unless the enacting body clearly indicates to the contrary].) The two prior prison term enhancements imposed in this case arose out of convictions for felony taking of a vehicle without the owner's consent (Veh. Code, § 10851, subd. (a)), and burglary (§ 459). Neither of these offenses are qualifying offenses under section 667.5, subdivision (b), as amended.

We will instruct the court to strike defendant's one-year prior prison term enhancements on remand.

---

[11] At sentencing, the court determined the prior prison term enhancement arising from a conviction for receiving stolen property (§ 496, subd. (a)) was "not eligible to be imposed."

16.

## IV. Presentence Conduct Credits

Defendant and the People agree that the matter must be remanded for the trial court to amend the abstract of judgment with regard to defendant's entitlement to presentence conduct credits.[12] We agree.

The trial court noted that, at the time the instant offense was committed, defendant was in custody on another case and received credit on that case for the period from April 30, 2014 to February 23, 2017. The court initially calculated that defendant was entitled to 208 days of credit in this case for time actually served. However, after discussion with the parties, the court concluded defendant was entitled to an additional 212 days, for a total of 420 days of actual time credit. When defense counsel expressed concern that she could not readily determine whether the hasty recalculation was accurate,[13] the court stated, "Well, in that regard if there's no objection by anybody I'm going to call it 216 [additional days] because I know that's more than what the number of day [*sic*]." The court then stated, "So I'm going to give him an additional 216 for 424, which would give him 64 good and work but that will be calculated by CDC." The court minutes and abstract of judgment reflect an award of 424 days actually served and no conduct credit.

The sentencing court is responsible for calculating custody credits. (*People v. Buckhalter* (2001) 26 Cal.4th 20, 30.) Thus, the court was required to calculate and award presentence conduct credit. (*Ibid.* ["'[T]he court imposing a sentence' has responsibility to calculate the exact number of days the defendant has been in custody

---

**12** Defendant initially argued the abstract of judgment should be amended to reflect 410 days of actual time credit, and 61 days of presentence conduct credit. The People argued that defendant was entitled to 420 days of actual time credit and 63 days of presentence conduct credit. Defendant then agreed to the People's calculation entitling him to 63 days of presentence conduct credit, and stated that he agreed with the People's calculation of actual time credit, which defendant mistakenly noted as 434 days.

**13** The court's recalculation of 420 days was, in fact, accurate.

17.

'prior to sentencing,' add applicable good behavior credits earned pursuant to section 4019, and reflect the total in the abstract of judgment."]; see § 2900.5, subd. (d) [the sentencing court is required to determine the number of days of conduct credits earned pursuant to § 4019].) The parties agree the court erred in failing to do so here.

Defendant was entitled to actual time credit for the period from and including February 24, 2017, through and including April 19, 2018, a total of 420 days. Although the People do not expressly advocate for correcting the abstract of judgment to reflect a reduction in defendant's actual custody credits to 420 days, defendant concedes correction is appropriate in order to accurately calculate his presentence conduct credits. Defendant accrued presentence conduct credit at a rate of 15 percent of his actual time served. (§ 2933.1.) Accordingly, he was entitled to 15 percent of 420 days, for a total of 63 days of presentence conduct credit.

We will instruct the court to correct the abstract of judgment to reflect that defendant was entitled, at the time of sentencing, to 420 days of actual time credit, and 63 days of presentence conduct credit.

## DISPOSITION

The matter is remanded to allow the trial court to consider whether to exercise its discretion to strike the prior serious felony enhancements pursuant to Senate Bill No. 1393 (see §§ 667, 1385, subd. (b)(1)). If necessary, after the exercise of its discretion, the trial court shall resentence defendant as appropriate. On remand, the trial court shall also strike the one-year prior prison term enhancements (§ 667.5, subd. (b)) pursuant to Senate Bill No. 136, and shall correct the abstract of judgment to reflect that defendant was entitled, at the time of sentencing, to 420 days of actual time credit and 63 days of presentence conduct credit. The trial court is directed to prepare an amended

abstract of judgment reflecting these modifications, and to forward a certified copy to the appropriate entities.

In all other respects, the judgment is affirmed.


MEEHAN, J.

WE CONCUR:


HILL, P.J.


POOCHIGIAN, J.