Filed 4/7/26  Sandoval v. Acadia Healthcare Co. CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| KIMBERLY SANDOVAL,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ACADIA HEALTHCARE<br>COMPANY, INC.,<br><br>        Defendant and Appellant. | A168461<br><br>(Marin County<br>Super. Ct. No. CIV1802171) |

The day after he checked himself into Bayside Marin Treatment Center (Bayside) to treat his alcohol dependence, Rahul Pinto fell down a set of stairs and later died of his injuries.  His widow, respondent Kimberly Sandoval, sued Acadia Healthcare Company, Inc. (Acadia), Bayside's owner, for negligence.  In this appeal following a jury trial, Acadia contends that Sandoval sued the wrong entity, that the trial court made multiple erroneous evidentiary rulings, that substantial evidence does not support the verdict, and that this court should reduce the award of noneconomic damages.  We reject these arguments and affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Acadia is a publicly traded company that, as of February 2018, owned more than 225 psychiatric hospitals and addiction-rehabilitation and health

1

clinics across the United States. This includes Bayside, a residential rehabilitation center in San Rafael offering treatment for drug- and other substance-abuse disorders.

Bayside is split into two separate areas: the main campus on the "Mountain View" side, and the newer "Canyon View" side. The Mountain View side has a health services center with two beds typically used for patients experiencing detoxification (detox), along with three other residential buildings. There are 18 beds on this side of the facility. Nurses prefer to place detox patients in the health services center so they will be close to the nurses' station for monitoring, but there is no designated area for these patients, and they can be placed anywhere on the property.

The Canyon View side includes two residential buildings, including one also called Canyon View, for a total of six buildings on the campus. There are 12 beds on the Canyon View side, with a total capacity at Bayside of 30 beds. The California Department of Health Care Services separately licenses the buildings at Bayside. A witness who testified as an expert on the state regulations governing residential alcohol- and drug-treatment programs explained that any building housing a detox patient is required to ensure that someone is available at all times to meet the patient's needs.

Another witness, a doctor specializing in addiction medicine, described the detox or "withdrawal management" process. People who are dependent on alcohol adapt to the sedation alcohol causes, and the withdrawal that occurs when alcohol is taken away affects their nervous system. The effects may include shaking, sweating, an increased heart rate, and, in severe cases, "delirium tremens," which may affect cognitive functions. Complications tend to arise in the first 72 hours of the withdrawal process, according to the doctor. Providing a class of medications called benzodiazepines, which are

similar to alcohol and act as a "sedative hypnotic," can help control withdrawal symptoms.

Bayside had three levels of monitoring people going through detox. These levels were assigned as patients were scored. One score, called Clinical Institute of Withdrawal Assessment, or CIWA, measures 10 signs of alcohol withdrawal and has a maximum score of 67. A score of 12 or more would be communicated immediately to a physician, and a score of 15 or more indicated severe withdrawal. New admittees also were scored using another measure, the Global Assessment Function, or GAF, which has a scale of zero through 100, with 100 being the highest level of functioning. Of the three levels of monitoring, level 1 is "the highest level," and these patients were required to be monitored every 30 minutes.

Pinto was admitted to Bayside the afternoon of January 21, 2017. He appeared "rather inebriated" while signing admissions papers, and his blood alcohol was measured to be 0.303 percent, an "almost life-threatening level[] of alcohol concentration." Pinto reported that he drank around a half pint of vodka each day and that he had a shot of vodka each morning to eliminate "shakes." He also reported that he smoked a half a pack of cigarettes each day.

The nurse practitioner who evaluated Pinto assigned him a GAF score of 30, indicating "the serious impairment . . . of his judgment." He was "going into active withdrawal" and was admitted to be monitored at level 1. Pinto was assigned at least three CIWA scores on the day he was admitted. The first time his score was 11, but it later went to 10, and later still went to 13. The nurse ordered that he receive 30 milligrams of Librium every two hours for sedation. Pinto was assigned to a private, downstairs room in the Canyon View house, even though "detox clients" were rarely, if ever, assigned there.

The house is built on the side of a hill that requires residents to walk up and down a steep staircase to enter and exit the front door.

Generally there were either two nurses or licensed psychiatric technicians working each shift at Bayside, usually one on each side of the campus. Bayside was required to have a nurse or clinical technician in each house. But only medical staff (such as nurses) were responsible for monitoring withdrawal symptoms, not clinical staff.

Bayside was full on January 22, the day after Pinto was admitted. Pinto's CIWA score had risen to 19 as of that morning, a sign he was experiencing an increased severity of alcohol withdrawal and that his judgment and mobility were possibly impaired.

That day, one of the two nurses responsible for monitoring people going through detox did not show up for work. The nurse who showed up (the onsite nurse) was originally assigned to the Canyon View side of the property, which meant she was responsible for assisting anyone going through detox in the Canyon View house or the other residential house on that side of the campus. The nurse who did not show up (the absent nurse) had been the director of nursing, although he recently had been demoted after staff expressed concerns over his performance and attendance. Evidence was presented that in the fall of 2016, the absent nurse had been required to submit to random drug testing for 90 days and to participate in therapy.

The absent nurse was the onsite nurse's supervisor, and the onsite nurse apparently was unaware that he had been demoted. After she arrived for her shift on January 22, the onsite nurse called and texted him (the absent nurse) about the absence, but she did not receive a response. The absent nurse never showed up that day, and nobody filled in as a

4

replacement. The onsite nurse later testified that it was "very rare" for someone to be responsible for monitoring all the patients on the entire property, and it was the first time it had happened to her. Another nurse testified at trial that there was no official policy in place for how a nurse's no-show should be handled.

During a meeting at the beginning of her shift, the onsite nurse was informed of the patients who were experiencing detox and where they were located. A total of six (including Pinto) of the 30 clients at Bayside were going through detox. On the Canyon View side, a patient in the same house as Pinto was a level 3, and there were two other level 3 patients at the other house. On the Mountain View side, one patient was a level 2, and another was a level 1. The onsite nurse was therefore responsible for monitoring one level 1 client on each side of the property once every 30 minutes, each of the level 2 clients at least once an hour, and each of the level 3 clients at least once every two hours. If the absent nurse had shown up for work, or if a replacement had been assigned, the onsite nurse would have been responsible for only the patients housed in the two buildings on the Canyon View side. In addition to monitoring the detox patients, the onsite nurse was also responsible for giving medicine to residents for them to self-administer, though counselors and clinical technicians were able to help with that task.

Pinto was asleep at 7:00 a.m., and he was sedated and his blood pressure was low. At 10:00 a.m., he was awake, and he was assigned a CIWA score of 19. This score was assigned for several reasons, including that he was experiencing tremors that were visible when he put his arms up and was experiencing paroxysmal sweats. The onsite nurse gave him 30 milligrams of Librium, which causes drowsiness. The onsite nurse considered Pinto to be a fall risk since he was experiencing tremors, and he appeared slightly anxious

5

and agitated. But she did not believe that he needed a "sitter" to stay with him. Instead, she told him that he was on medication that could make him sleepy, encouraged him to stay in bed, and told him she would bring him anything he needed, including meals. She also told him she could help if he needed assistance to get up for any reason, including using the restroom. (Although Bayside policy barred cell phones for new clients, Pinto had a landline telephone in his room along with the number for the nurses' station and the onsite nurse's cell phone.) The onsite nurse later acknowledged that, had she not been responsible for the entire property that day, she would have spent "a lot more time" with Pinto.

The onsite nurse continued to check in with Pinto every half hour. At some point Pinto asked if he could smoke, and the nurse told him he was not allowed to smoke indoors and that there was a designated outdoor smoking area. She encouraged him multiple times during the day to stay in bed since he "looked like the kind of man that was always on the go" and she "could just tell that he was not this lazy guy that just wanted to sleep all day."

By 2:00 p.m., Pinto's CIWA score was 22, and his tremor score was seven, which is the maximum and indicates the person is in severe withdrawal and visibly shaking without asking them to move. The onsite nurse called the on-call nurse practitioner to report Pinto's condition. The nurse practitioner directed the onsite nurse to increase Pinto's dose of Librium from 30 milligrams every two hours to 50 milligrams every two hours, and Pinto took the medication around 2:00 p.m. The onsite nurse had been trained that when someone's CIWA score is 15 or higher, they should be observed more closely and that a doctor should be called since the person would be at risk of going into delirium tremens. The on-call nurse practitioner did not order more monitoring for Pinto, only that his medication

6

be increased.  This nurse later testified that "Mr. Pinto's detoxification was typical of what we would have expected, and there was no need for any further monitoring other than what was already in place."  The onsite nurse encouraged Pinto to stay in bed because he had just taken a sedative that would make him at risk for falling.  When she checked back in with Pinto at 2:30 p.m., he was getting out of the shower.

The onsite nurse testified that she again saw Pinto at around 3:00 p.m., and he was awake and alert.  Shortly thereafter, without the nurse present, Pinto climbed the stairs from his residence to the designated smoking area.  When he left that area to return to the Canyon View house, he fell down the stairs.  Another resident of Canyon View testified that it appeared Pinto "stumble speed walk[ed]" down the top of the stairs, and it appeared "he was kind of unsteady, running almost, but not controlled, down some stairs."  As he made his way down the stairs, Pinto "launched off the stairs in like a Superman fashion . . . , meaning he went straight out, like parallel to the ground," and landed face down on a deck.  A doctor who specialized in addiction medicine opined at trial that it was more likely than not that Pinto's fall was related to an impaired gait from the withdrawal and ingestion of sedatives.

A housekeeper who was in the Canyon View house heard Pinto fall and left to report the accident to the onsite nurse.[1]  A clinical technician who had walked to the area after starting work saw Pinto bleeding on the ground and called 911.  She saw a chef and housekeepers in the area, but no nurse.  The technician later testified it "felt like forever" before the nurse arrived, around

---

[1] There was conflicting testimony at trial about where the onsite nurse was at the time of the fall.  The housekeeper testified that the nurse was on the Mountain View side of Bayside, whereas the nurse testified that she was on the Canyon View side.

7

five or six minutes later. The clinician also testified that she was "[v]ery" upset that no staff member was present when the fall happened and that she "felt like we let a client down."

Paramedics arrived and took Pinto to Marin General Hospital with a severe head injury and an abdominal hemorrhage. He underwent multiple surgeries over the following months, was transferred to different facilities, and remained mostly in a comatose to vegetative state. As discussed in more detail below, Sandoval presented evidence that Pinto incurred a total of more than $2.3 million in medical expenses during this time. He died in July 2017.

Sandoval in June 2018 filed her lawsuit alleging negligence.[2] Trial was held over 15 days in spring 2023. A doctor who was board certified in addiction medicine opined that given the state Pinto was in on the day of his fall, he required someone trained in detox to be monitoring him. And the fact there was not someone trained in detox available "to keep an eye on him and observe him" meant that the facility provided inadequate observation. Sandoval did not claim, however, that any personnel's actions on the day of the accident fell below the standard of care.

Jurors returned a special verdict concluding that Acadia was negligent and that its negligence was a substantial factor in causing harm to Pinto. Jurors also concluded that Pinto was negligent and assigned him one percent of the responsibility for causing his harm. They awarded more than $6.6 million in wrongful death damages, and more than $2.4 million in survival damages to Pinto's estate for the medical expenses he incurred and the income he lost after he was injured and before he died. Judgment was entered in April 2023.

---

[2] As a successor-in-interest to the estate of Pinto, Sandoval also sued on behalf of the estate. For simplicity, we refer only to Sandoval as the plaintiff.

8

Acadia filed a motion for judgment notwithstanding the verdict, a motion to set aside and vacate the judgment, and a motion for a new trial. The trial court denied all three motions.

## II.
### DISCUSSION
### A. Acadia Has Not Established that the Trial Court Erred When It Barred Acadia from Arguing that Sandoval Sued the Wrong Entity.

#### 1. Additional Background.

Sandoval's initial complaint named "Acadia Healthcare Company, Inc., a Delaware corporation, individually and doing business as Bayside Marin Treatment Center." (Some capitalization omitted.) Her first amended complaint named the same defendant, as did her second amended complaint. The complaint alleged that Bayside was "a California alcoholism or drug abuse recovery or treatment facility as defined by Health and Safety Code section 11834.02." In setting forth the events of the day of the accident, the complaint referred to "defendants" Acadia and Bayside.

In October 2018, an answer was filed on behalf of "Acadia Healthcare Company, Inc., a Delaware corporation, individually and dba Bayside Marin Treatment." (Some capitalization omitted.) And throughout discovery, individuals responded to Sandoval's discovery requests attesting they were an officer or agent of "Acadia Healthcare Company, Inc." which was "doing business as Bayside Marin Treatment Center."[3] Similarly, in November 2021

---

[3] Counsel later told the trial court that the people who signed discovery verifications "just signed and dated" forms that were prepared by counsel using the name that was alleged in the complaint and so there was no affirmative statement being made since "the box was already checked" when they received the forms. The court responded that "[t]he argument is falling on deaf []ears. . . . If you are suggesting that signing something under penalty of perjury means nothing if somebody else prepared the document, that's absurd."

9

a summary judgment motion was filed by "Acadia Healthcare Company . . . doing business as Bayside Marin Treatment Center."[4]

According to Acadia, Bayside is in fact a wholly owned subsidiary of Acadia, and Acadia has no employees. One of Acadia's attorneys attested that "Bayside Marin, Inc. is owned by CRC Health, LLC which is owned by CRC Group, LLC, which is owned by Acadia Healthcare, Company, Inc." Apparently the first time Acadia's counsel raised this issue with Sandoval's attorneys was in September 2022—more than four years after Sandoval filed her lawsuit. Counsel wrote an email to Sandoval's counsel stating that "there [was] no legal entity in existence with the name" of the sole defendant named in the pleadings. Counsel claimed this was because Sandoval "did not serve the 3.0 Series of Judicial Interrogatories asking for the name and corporate status of my client so this issue was not discovered until I was preparing the Trial documents." The attorney proposed that Sandoval "serve a DOE Amendment naming DOE No. 1 as Bayside Marin, Inc." In an issues conference statement filed that same month Acadia also informed the trial court—again, apparently for the first time—that Sandoval had not sued the correct legal entity.

The parties in October 2022 entered into a stipulation acknowledging that Sandoval had named as defendant Acadia, doing business as Bayside Treatment Center, and that Acadia had filed an answer and other pleadings using that name. The parties thus stipulated that each time the name "Acadia Healthcare Company, Inc., a Delaware corporation, individually and

---

[4] The trial court later asked Acadia's counsel, "Why would I be . . . granting you the ability to bring a motion for summary adjudication for a party that isn't responsible for the—improperly named party? Why would I bother doing all of that work unless you told me that I had the right party in the case?"

doing business as Bayside Marin Treatment Center" appeared on any pleadings, it was to be understood to have meant "Acadia Healthcare Company, Inc., *erroneously sued* as Acadia Healthcare Company, Inc., a Delaware Corporation, individually and doing business as Bayside Marin Treatment Center." (Italics added.)

Sandoval also followed Acadia's suggestion and, in November 2022, filed a Doe amendment naming Bayside Marin, Inc., a Delaware corporation, as a Doe defendant. Though the pleading does not appear in the appellate record, apparently the entity (through Acadia's attorneys) then demurred based in part on the argument that the complaint had not been served on it within three years (see Code Civ. Proc., §§ 583.210, subd. (a), 583.250, subd. (a)(1)). Based on the belief that the correct defendant had been named, Sandoval saw "no practical reason" to oppose the demurrer, and the named Doe defendant was dismissed without prejudice. (Again, though, the dismissal is not contained in the appellate record.)

Before trial, Sandoval filed a motion in limine to exclude any evidence or argument that Acadia was improperly named in the complaint and was not responsible for Bayside Treatment Center. In opposition, Acadia argued that the motion was an improper request to "make an alter ego determination" that Bayside was "an empty shell" of Acadia. And Acadia filed its own motion in limine for an order precluding evidence about "the incorrect name of defendant, Acadia Healthcare Company, Inc. on any document filed or served" before the parties stipulated in October 2022 to "correct[] the name of defendant."

At the hearing on the motion, Sandoval's counsel argued that Acadia had falsely represented for four years of litigation that it had been named correctly in the complaint, and had only recently contended that Bayside was

11

a separate, standalone entity. Counsel argued that because Sandoval had relied on Acadia's verified discovery responses and the fact the company had never raised the issue of Bayside Treatment Center being the responsible party, it would be "patently unfair" for Acadia to place blame on Bayside so late in the proceedings. Acadia's attorney responded that it was Sandoval's legal obligation to sue the appropriate defendant and that her attorneys "knew who Bayside Marin was the entire time" and its existence "was not a mystery." Counsel contended that Sandoval was "hoping to take advantage of a materially incorrect fact that got corrected" by stipulation, and that neither judicial estoppel nor an alter-ego theory applied. Acadia's counsel proposed continuing the trial date to allow discovery, followed by a court trial on the issue of whether Acadia was an alter ego of Bayside Treatment Center. Sandoval's counsel, by contrast, took the position that Acadia should be judicially estopped from arguing that it was the wrong defendant, and the attorney presented a series of slides showing all the various employee verifications submitted over the years of litigation stating that they worked for Acadia.

The trial court ultimately concluded that Sandoval had established the elements of judicial estoppel and that Acadia had forfeited the argument that Sandoval had sued the wrong defendant. The court further found that Sandoval was entitled to relief from the October 2022 stipulation regarding which entity was sued, since it was entered into when Acadia invited Sandoval to sue Bayside Treatment Center as a Doe defendant. Since that "ended up not happening," the court concluded that the stipulation was not binding, "particularly where the defendant has held itself out to the Court and to plaintiffs' counsel as the properly named, responsible defendant throughout the proceedings." The court thus denied Acadia's motion seeking

12

to bar evidence that it was wrongly sued, and it granted Sandoval's motion to preclude evidence that Acadia was wrongly sued. And Acadia was precluded from introducing evidence regarding corporate structure. The court's ruling did not prevent Acadia from introducing evidence that it was not directing the employees at issue, only "from arguing or putting on evidence that it's not the responsible party because plaintiff failed to name the proper entity."

### 2. Acadia Does Not Establish Error on Appeal.

Acadia's opening brief contains a section titled, "The court should reverse and direct entry of judgment for Acadia because it is not the proper defendant. At minimum, the court should order a new trial due to prejudicial instructional error regarding Acadia's alleged responsibility for Bayside Marin's actions and omissions." (Bold omitted.) Acadia devotes two pages to arguing that Sandoval sued the wrong entity before mentioning the trial court's ruling that the company was judicially estopped from raising this argument at trial. But instead of directly addressing why the court erred, the company first recites general principles about the adversarial nature of our legal system—relying on cases that have nothing whatsoever to do with judicial estoppel. (See *Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 492 [summary judgment appropriate where privilege was affirmative defense to defamation]; *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 28, 40 [trial court erred in applying litigation privilege to statements made in pre-lawsuit communication]; *City of El Monte v. Superior Court* (1994) 29 Cal.App.4th 272, 277 [defense counsel under no obligation to alert plaintiff seeking punitive damages that no evidence was presented on the topic before jury considered case]; *Rude v. Cogen* (1964) 225 Cal.App.2d 247, 251 [husband not permitted to pursue action against attorney who represented

ex-wife in previous lawsuit].)  Reviewing the trial court's actual ruling under the appropriate standard of review, we find no error.

" 'Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.  The doctrine serves a clear purpose: to protect the integrity of the judicial process.' " (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181.)  " ' "The doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process. . . .  'The policies underlying preclusion of inconsistent positions are "general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings." ' . . . Judicial estoppel is 'intended to protect against a litigant playing "fast and loose with the courts." ' " ' [Citation.]  'It seems patently wrong to allow a person to abuse the judicial process by first [advocating] one position, and later, if it becomes beneficial, to assert the opposite.' " (*Ibid.*)  Although applying the doctrine has been characterized as " 'confusing,' " " 'at best uncertain,' " and " 'vague' " (*id.* at p. 182), courts have found it appropriate to apply the doctrine where: "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." (*Id.* at p. 183.)  "Judicial estoppel is an equitable doctrine to protect against fraud on the courts.  [Citation.]  It has been said that '[b]ecause of its harsh consequences, the doctrine should be applied with

caution and limited to egregious circumstances.' " (*Blix Street Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th 39, 47.)  The parties apparently agree that we review the trial court's ruling for abuse of discretion.  (*Id.* at pp. 46–47.)

Nowhere in Acadia's opening brief does the company address the foregoing elements.  And it apparently does not dispute that it took two different positions—first responding to Sandoval's complaint as if the proper entity had been sued, then (after the time to add a party by Doe amendment had passed) contending that no such entity existed.  Instead, the company emphasizes that it was Sandoval's burden to name the correct defendant. Again, though, the company relies on cases that did not involve judicial estoppel.  Instead, they involved vastly different factual situations, such as where a plaintiff "offer[ed] no explanation for why [a subsidiary] was not or could not have been named as a defendant" (*Futterman v. Kaiser Foundation Health Plan, Inc.* (2023) 91 Cal.App.5th 656, 663), or where a defense attorney explained to the plaintiffs *at a hearing on a demurrer* (i.e., early in proceedings) that the wrong entity had been named and the trial court *warned plaintiffs that dismissing the existing defendant might lose them their entire suit* (*Pinkerton's, Inc. v. Superior Court* (1996) 49 Cal.App.4th 1342, 1345).

Also inapposite is the caselaw Acadia relies on when it takes the extraordinary position that it would have been *improper* to order Acadia to disclose in discovery that Bayside and Acadia are separate entities, since that information is "publicly available on the California Secretary of State's website."  (See *Sav-On Drugs, Inc. v. Superior Court* (1975) 15 Cal.3d 1, 5 [defendant not required to disclose "specific statutes and administrative regulations supporting" its claimed tax deductions since "the California Revenue and Taxation Code and the California Administrative Code are as

15

readily available to real party in interest as to" plaintiff]; *Alpine Mutual Water Co. v. Superior Court* (1968) 259 Cal.App.2d 45, 53–54 [plaintiffs not required to answer interrogatories regarding publicly available information about property *they did not own*].)  We flatly reject Acadia's suggestion that it would not have been required to answer a direct question about the proper entity to be sued.

Acadia waits until its reply brief to acknowledge the elements of judicial estoppel.  It is settled that the court need not consider points first raised in a reply brief.  (*Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 351; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10.)  But even considering the merits, Acadia's arguments fail.  The company claims it never took "inconsistent" positions on whether the correct entity was sued, it "simply filed its answer and other trial court documents . . . because that was the name Sandoval used in her own complaint."  It claims that filing an answer another way would have "risk[ed] waiving an otherwise valid affirmative defense."  But this is just another way of unpersuasively arguing that it was entitled to take affirmative actions to lull Sandoval into believing she had sued the correct entity until after the limitations period passed.  Acadia also insists that all the representations that attorneys made on behalf of the company were the result of ignorance or mistake since they relied on the name set forth in Sandoval's complaint.  We reject the notion that Acadia could accept Sandoval's allegations up to the deadline to serve a Doe defendant, but then disclaim them after the period had run.

And the fact remains that Acadia gave every indication for the first four years of litigation that Sandoval had sued the correct entity.  One case cited by Acadia addresses such a situation, and it supports Sandoval.  In

16

*Cuadros v. Superior Court* (1992) 6 Cal.App.4th 671 (*Cuadros*), a plaintiff sued for damages after she was hit by the driver of a car rented from a Budget Rent-A-Car franchise. (*Id.* at p. 673.) The plaintiff sued "Budget Rent-A-Car Systems, Inc." (*Ibid.*) "Budget Inc." filed an answer stating it had been "erroneously sued as Budget Rent-A-Car Systems, Inc." (*Ibid.*) After an attorney employed by Budget Rent-A-Car allegedly told the plaintiff's counsel that the rented vehicle was owned by "K.H. Group, doing business as Budget Rent A Car of Santa Monica" (Budget Santa Monica) the plaintiff designated that entity as a Doe defendant. (*Ibid.*) Budget Santa Monica also answered the complaint. (*Id.* at p. 674.) During an arbitration conducted nearly three years after the plaintiff first sued, an attorney for defendants "revealed for the first time that the vehicle involved in the collision was owned by Budget Rent-A-Car of Westwood (Budget Westwood)." (*Id.* at pp. 673–674.) The arbitrator then entered judgment in favor of the named defendants. (*Id.* at p. 674.) The plaintiff sought to vacate the arbitration award and also sought to amend the complaint to name Budget Westwood. (*Ibid.*) The trial court granted the motion to vacate but denied the motion to amend since the statute of limitations barred the plaintiff's claim, apparently concluding that the defendants did not owe a duty to disclose any information about the true identity of the vehicle's owner. (*Id.* at pp. 674–675.)

The appellate court issued a writ of mandate directing the trial court to permit the plaintiff to amend her complaint. (*Cuadros, supra*, 6 Cal.App.4th

17

at p. 678.)[5]  The court noted that the plaintiff's counsel "had been laboring [under the misconception] for over three years . . . that the defendants who answered the complaint, engaged in settlement negotiations, settled a portion of the claim, diligently pursued discovery, participated in an arbitration, and stipulated to the dismissal of Doe defendants and to binding arbitration possessed an ownership interest in the vehicle."  (*Id.* at p. 677, fn. omitted.)  The court concluded that "[w]hile we do not impose upon defendants an affirmative duty to disclose to [the plaintiff] her error, defense counsel is prohibited from taking willful action to mask that error from" plaintiff, which counsel did for more than three years by "conduct[ing] themselves as though they were properly named as defendants."  (*Ibid.*)  And while it was true that the plaintiff's counsel could have conducted additional discovery, the court ultimately concluded that "*it was entirely reasonable*, under the circumstances of this case[,] for [the plaintiff's] counsel to have relied on the acts and statements of defendants in concluding that he had named the proper parties.  Moreover, we are more concerned with balancing the equities than with highlighting the negligence of [the plaintiff's] counsel.  When all the circumstances are considered, the equities *overwhelmingly favor* [the plaintiff]."  (*Id.* at pp. 677–678, italics added.)

Likewise here, it was reasonable for Sandoval to conclude, based on years of conduct by Acadia's counsel and those who responded to Sandoval's discovery requests, that she had sued the correct entity.  We simply disagree

---

[5] The court did not rely on judicial estoppel but instead relied on "equitable estoppel," which "affirms that a defendant may not by his [or her] statements or conduct lull the plaintiff into a false sense of security resulting in inaction.  [Citations.]  The determination of whether a defendant's conduct is sufficient to invoke the doctrine is a factual question entrusted to the trial court's discretion."  (*Cuadros*, *supra*, 6 Cal.App.4th at p. 675.)

with Acadia's contention that it "did nothing to mask from Sandoval the two separate legal identities." And it is particularly misleading for Acadia to argue that the parties' stipulation that Acadia was "erroneously sued" under the wrong name somehow "undermines the [trial] court's judicial estoppel finding," since the trial court ruled that Sandoval was *not bound by the stipulation* given Acadia's conduct. On appeal, Acacia does not directly challenge the trial court's ruling that Acacia was not bound by the stipulation.

Given Acadia's repeated actions over the years indicating that the correct legal entity had been sued, we disagree with its contention that, after years of litigation, the trial court should have "at least required Sandoval to amend her complaint" and "conduct[] a bench trial" on the issue of "alter ego." While that may have been one of several alternative approaches the court could have taken, we find no error in the approach the court did take or in its ruling based on judicial estoppel. Since there was no error, we reject Acacia's ancillary argument that the jury instructions were faulty in describing the corporate entity being sued.

### B. The Trial Court Properly Admitted a Summary of Costs for Pinto's Medical Expenses.

#### 1. Additional Background.

Sandoval issued a deposition subpoena for the production of business records on Blue Cross of California. In response, Blue Cross's parent company, Elevance Health, produced a 15-page itemization of the medical benefits provided to Pinto while he was hospitalized after his fall. Along with the spreadsheet, an associate general counsel at the parent company provided a declaration attesting that that the record was prepared by personnel of the company in the ordinary course of business, that the record

19

was generated from electronic billings and payment information that Blue Cross kept in the ordinary course of business at or near the time payments were made, and that it was the parent company's ordinary custom and practice to record in its electronic database all payments Blue Cross made to medical providers on behalf of covered patients at or near the time those payments were made. The foregoing information was used to generate the itemization.

At trial, Sandoval offered into evidence, and Acadia objected to, the itemization. Acadia argued the document was hearsay, lacked foundation, and did not comply with Evidence Code section 1560, subdivision (e),[6] regarding subpoenaed parties making documents available for copying. Following argument about both the admissibility and relevance of the spreadsheet, the trial court first concluded that Sandoval had laid the foundation for the business records exception to the hearsay rule (§ 1271). Although the court allowed the admission of the amounts Blue Cross paid for services rendered to Pinto, it ruled that some of the information on the spreadsheet involved another layer of hearsay and thus was inadmissible: namely, the identity of the providers, the diagnostic descriptions, the procedure descriptions, and the charged (as opposed to paid) amounts. A version of the spreadsheet that omitted the excluded information was admitted into evidence showing only the amounts that Blue Cross paid for Pinto's medical services.

No testimony was apparently offered about the spreadsheet, though doctors who treated Pinto testified about the medical care they provided. During Sandoval's closing argument, counsel directed jurors to the itemization, and explained that the jury must consider whether the listed

---

[6] All undesignated statutory references are to the Evidence Code.

20

costs were for reasonably necessary medical care that Pinto received between the date of the accident and his date of death.

### 2. The Trial Court Did Not Abuse Its Discretion in Finding that the Summary Was an Admissible Business Record.

On appeal, Acadia renews its objection that the summary of medical costs admitted at trial was inadmissible hearsay. We review the trial court's decision to admit documents as business records for an abuse of discretion (*In re Conservatorship of S.A.* (2018) 25 Cal.App.5th 438, 447) and find no such abuse.

"[A]n injured plaintiff whose medical expenses are paid through private insurance may recover as economic damages . . . the amounts paid by the plaintiff or his or her insurer for the medical services received or still owing at the time of trial." (*Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 566.) To prove those amounts, Sandoval provided evidence that was admitted under the business records exception to the hearsay rule, which allows admission of hearsay if the following foundational elements are met: "(a) The writing was made in the regular course of business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (§ 1271.)

"Hospital records and similar documents are often admissible as business records, assuming a custodian of records or other duly qualified witness provides proper authentication to meet the foundational requirements of the hearsay exception. [Citations.] Compliance with a subpoena duces tecum may dispense with the need for a live witness to

21

establish the business records exception if the records are produced by the custodian or other qualified witness, together with the affidavit described in section 1561. (§ 1560, subd. (b).)" (*People v. McVey* (2018) 24 Cal.App.5th 405, 414.) Section 1561, in turn, provides that the affidavit must state "in substance each of the following: [¶] (1) The affiant is the duly authorized custodian of the records or other qualified witness and has authority to certify the records. [¶] (2) The copy is a true copy of all the records described in the subpoena duces tecum . . . . [¶] (3) The records were prepared by the personnel of the business in the ordinary course of business at or near the time of the act, condition, or event. [¶] (4) The identity of the records. [¶] (5) A description of the mode of preparation of the records." (§ 1561, subd. (a).)

Acadia has never disputed that Pinto incurred significant medical bills. Multiple medical providers testified about the care Pinto received during the months he was in a mostly comatose to vegetative state. During that time, he underwent surgeries and was transferred to different facilities. Acadia did not contend that this care was unnecessary, and it presented no evidence that the cost of Pinto's care was excessive. Instead, Acadia complains that the affidavit accompanying the cost summary was provided by the parent company of the subpoenaed party. Acadia contends that this fact means the declaration failed in these circumstances to support the introduction of the records into evidence since the records were "held by a *different* legal entity." But the affiant attested that during the relevant time period "it was *our business's* ordinary custom and practice to record in our electronic data base all payments Blue Cross of California made to medical providers on behalf of covered patients at or near the time those payments were made to the medical provider(s). That payment information would be securely stored in

22

*our* electronic data base." (Italics added.) The affiant further attested that he was "a qualified witness to certify the records attached to this affidavit." As the trial court quipped, "It says in the affidavit Elevance is the parent company of Blue Cross, so it's not like just a random company decided to send a response."

Acadia also objects that the spreadsheet was not made at or near the time of the act, condition, or event (§ 1561, subd. (a)(3)), but instead was generated using such data. But again, the affiant attested that the record was generated from electronic billing information that Blue Cross recorded in the ordinary course of business at or near the time the payments were made. True, the affiant explained that the document was "generated" using that electronic billing and payment information. But "a printed compilation of . . . data produced by human query for use at trial falls under the business records exception where the underlying data is automatically recorded and stored by a reliable computer program in the regular course of business." (*People v. Zavala* (2013) 216 Cal.App.4th 242, 248 [admission of Excel spreadsheet generated for trial using phone call data].) "That the document[] ultimately entered in trial w[as] necessarily produced by human query does not render the data inadmissible because the underlying data itself was not produced by human input, but rather, was recorded by the computer system itself." (*Ibid.*) The spreadsheet here complied with those requirements, and the trial court "thus did not abuse its discretion in finding that sufficient foundation was laid to establish admissibility under the business records exception in Evidence Code section 1271." (*Ibid.*)

We reject Acadia's argument that this case is analogous to *People v. McVey*, *supra*, 24 Cal.App.5th 405. Quoting our Supreme Court, *McVey* held that " 'When a record is not made to facilitate business operations but,

23

instead, is primarily created for later use at trial, it does not qualify as a business record.' " (*Id.* at p. 415, quoting *People v. Sanchez* (2016) 63 Cal.4th 665, 695, fn. 21.) Both *McVey* and *Sanchez* involved police reports, which are far different from a spreadsheet summarizing payment data stored electronically by a business in the regular course of its business. The trial court did not abuse its discretion in admitting information about amounts paid for Pinto's medical expenses.

### C. The Trial Court Did Not Abuse Its Discretion by Admitting Limited Expert Opinion on Applicable Regulations.

#### 1. Additional Background.

Sandoval disclosed as an expert a former chief of licensing at the California Department of Health Care Services (formerly the Department of Alcohol and Drug Programs). He was designated to testify about the regulations and certification standards that apply to residential-treatment facilities.

Acadia moved in limine for an order to prevent the witness "from offering testimony of his conclusions of law and his interpretation of statutes and regulations." According to Acadia, the expert opined during his deposition "the meaning and interpretation" of certain provisions of the California Code of Regulations, and such testimony would be improper at trial since "an expert witness is not to offer his or her opinion about what the law says." Acadia further contended that the expert's opinion was "totally inaccurate" since he "improperly conflates separate statute[s] and regulations and invents language not in the regulation or statu[t]e." Sandoval opposed the motion.

At the hearing on the motion, the trial court suggested that it would be appropriate for the expert to testify about applicable regulations but that it

would be "a little bit of a problem" if the expert were to opine that Acadia did not follow those regulations. The court said it might be acceptable for the expert to help the jury understand the regulations if they were confusing, but not to say whether he thought Acadia had violated them. After hearing argument from both sides, the court ruled that Sandoval's expert could testify "generally about what the[] regulations mean" and which ones applied to the facts of this case. And the court further ruled that where there were "case specific facts in evidence before the expert testifies, he can testify as to those things in the context of the regulations." The court further ruled, though, that the expert could not testify that Acadia violated any specific code sections.

At trial, the expert testified that he was familiar with California Code of Regulations Title 9 (Title 9), beginning with section 10500, governing all residential programs that provide substance-abuse or recovery services in the state. The expert confirmed that Bayside was licensed under Title 9. (See Cal. Code Regs., tit. 9, § 10501, subd. (a)(6).) When asked whether the regulations addressed staffing standards, the expert explained that "[t]he regulations just talk about having staffing" but that there are "no actual staffing ratios established in the regulations." Instead, staffing ratios are in certification standards that are established for outpatient programs. In general, the regulations require that a facility have staff that understands what type of clients they have, along with the experience and training to provide needed services to those clients.

As for situations where regular staff members are absent, the expert explained that "there shall be coverage by personnel capable of performing the assigned task as evidenced by on-the-job performance, experience and training." (See Cal. Code Regs., tit. 9, § 10564, subd. (h).) Applied in the

25

context of this case, the "minimum requirements" are that if a client is receiving detox services and a staff member responsible for those services leaves, there must be someone else who is adequately trained to provide those same services. And the expert explained that the regulations require that each licensed facility must provide continuing operation and administration when there is an absence of regular administrative personnel. (See Cal. Code Regs., tit. 9, § 10564, subd. (a)(2).) Because Bayside has multiple buildings that are separately licensed, each house was required under the regulations to ensure that someone going through detox would have someone at the facility to provide necessary services.

Bayside was certified under 2004 certification standards. The expert explained that those standards also required that residential-treatment facilities that provide detox services must have an appropriately trained staff member around the clock where a client is housed.[7] (On cross-examination, the expert acknowledged that Canyon View house was not required to have a nursing station.) The standards further provide that each person who is undergoing detox at a facility shall be observed and physically checked every 30 minutes during their detox period, to observe whether they are breathing. And at least one appropriately trained staff member shall be assigned to observe the client. According to the expert, either that person or someone else in the facility must be qualified to provide CPR and first aid. During cross-examination, defense counsel focused on whether treatment facilities are in fact required to have someone trained in detox services available at all

---

[7] As Sandoval points out, this is consistent with the testimony of Bayside's clinical director at the time of the fall. When asked whether Bayside was required in January 2017 to have a clinical technician to be in a house around the clock, the director testified, "There would be need [*sic*] to be someone in every house, whether that's a nurse or clinical tech."

26

times, or whether they are required only to have someone qualified to provide CPR and first aid.

The jury was instructed that if Acadia violated any of three California Code of Regulations, "and that the violation was a substantial factor of bringing about . . . harm, then you must find that Acadia Healthcare Company, Inc. was negligent unless you also find that the violation was excused." The court then listed the following three regulations. (1) "Facility personnel, including volunteers, shall be competent to provide the services necessary to meet resident needs, and shall be adequate in numbers necessary to meet such needs. Competence shall be demonstrated by accrued work, personal and/or educational experience and/or on-the-job performance." (Cal. Code Regs., tit. 9, § 10564, subd. (b)(1).) (2) "When regular staff members are absent, there shall be coverage by personnel capable of performing assigned tasks as evidence by on-the-job performance, experience or training. Residents shall not be utilized to fulfill this requirement." (Cal. Code Regs., tit. 9, § 10564, subd. (h).) (3) "Each resident shall have personal rights which include, but are not limited to the following: . . . to be afforded safe, healthful and comfortable accommodation to meet his or her needs." (Cal. Code Regs., tit. 9, § 10569, subd. (a)(3).) Jurors also were told that if they found that Acadia "did not violate any of the laws, or that the violation was not a substantial factor in bringing about the harm, then you must still decide whether Acadia Healthcare Company, Inc. was negligent in light of the other instructions."

During deliberations, the jury sent a note asking for a readback of the expert's testimony "starting from 'Definitions' section near the beginning (CA Code of Regs, [section] 10501-A facility." After argument from counsel, the court directed the court reporter "to read back to the jury any question asked

27

by [plaintiff's counsel] that has the number 10501(a) in it.  And any answer to a [plaintiff's counsel] question the witness gave to that same number in it, that will be the read-back."

The court reporter read back testimony where the expert was asked about the definition of a "facility" with respect to an alcohol and/or drug-recovery treatment.  The expert confirmed that Bayside met the definition of such a facility under California Code of Regulations, title 9, section 10501, subdivisions (a)(6) and (a)(27).  The expert also explained how the regulations described "premises."  (Cal. Code Regs., tit. 9, § 10501, subd. (a)(25).)  The last part of the readback was about plaintiff's counsel asking whether the regulations addressed requirements that a licensee must satisfy regarding the staffing of such facilities, and the expert testified, "Well, the definitions I read to you [California Code of Regulations, title 9, section] 10501[, subdivision] A6 talks about providing 24-hour services to clients.  And if you want me to define services, what that is, I can, but services also means detoxification services and any group or individual sessions or treatment planning.  Also, section number 27, which I talked about, [section] 10501[, subdivision] A27, says a facility is a facility that provides 24-hour services to clients.  And, again, services are detoxification services."  No other readback was requested before the jury reached a verdict.

2. Acadia Has Not Demonstrated an Abuse of Discretion.

Acadia renews its objection that the trial court impermissibly allowed the expert to testify about "the key regulations at issue."  We review the trial court's ruling to admit the expert testimony for an abuse of discretion (*People v. Lowe* (2012) 211 Cal.App.4th 678, 683) and conclude that there was no such abuse here.

An expert may testify to an opinion "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (§ 801, subd. (a).) "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (§ 805.) "However, an expert is not permitted to give an opinion on questions of law or legal conclusions. [Citations.] It is the role of the judge to decide purely legal issues." (*City of Rocklin v. Legacy Family Adventures-Rocklin, LLC* (2022) 86 Cal.App.5th 713, 728 (*Rocklin*).) "There is no hard and fast rule that the expert cannot be asked a question that coincides with the ultimate issue in the case. 'We think the true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved.' " (*People v. Wilson* (1944) 25 Cal.2d 341, 349; accord, *People v. Lowe, supra*, 211 Cal.App.4th at p. 684.)

We find this case analogous to opinion testimony offered in *People v. Jo* (2017) 15 Cal.App.5th 1128 (*Jo*) that was found to be admissible. In the defendant's trial on charges of child-custody deprivation, the prosecution called a retired deputy district attorney who testified as an expert on the role of the child-abduction unit and various aspects of family law. (*Id.* at pp. 1134, 1142.) The witness testified that there is a provision of the Penal Code that provides for situations where parents conceal a child because of domestic violence. (*Jo* at p. 1143.) Over defense objection, the witness was permitted to testify about what the law requires. (*Ibid.*) The appellate court concluded this did not amount to improper testimony on a question of law since the trial court could conclude that the existence of a defense "was sufficiently beyond common knowledge that the opinion of an expert would assist the trier of fact." (*Id.* at p. 1176; see also *Mora v. Big Lots Stores, Inc.*

29

(2011) 194 Cal.App.4th 496, 513 [permissible for former head Division of Labor Standards Enforcement to explain how department determines if an employee meets Industrial Welfare Commission's exemption from overtime payment], disapproved on another ground in *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 986, fn. 15.) Likewise here, the trial court could reasonably conclude that the existence and content of regulations covering alcohol-treatment centers was outside jury members' knowledge.

Key to *Jo*'s holding was the fact that although the expert offered an overview of the applicable statute, "she expressed no opinion as to whether or not [the law] applied to the particular facts of the case. Her testimony did not encompass any legal conclusion or opinion on any ultimate issue, and cannot be said to have usurped the jury's factfinding role." (*Jo*, *supra*, 15 Cal.App.5th at p. 1177.) Here, Acadia claims that the expert was permitted to testify as to "why he believed Acadia breached its alleged regulatory duty." But the passages highlighted by Acadia include testimony about the meaning of regulations generally, and not whether Bayside violated them. For example, Acadia highlights a passage where the expert testified that the regulations require a licensed facility to have a competent staff member available around the clock to meet the needs of a resident who was experiencing detox. And it highlights similar testimony about certification standards requiring that a residential treatment facility that provides detox services have an appropriately trained staff member available around the clock for detox patients' needs.

True, the expert was asked whether, since Bayview's houses were separately licensed, regulations would require that each house with a detox client have someone "in the facility 24/7 to provide the services required to meet the resident's needs." The expert testified over defense objection that

30

"[t]he regulations apply to each license irregardless [*sic*] if a program has several licenses in the same location. [¶] This type of facility is unusual in a sense. There are approximately 3,000 programs in California. And in my 21 years of doing this, as far as on one facility, there's only—there's probably less than five in the entire state that has multiple licenses at one location. [¶] So—but these—regardless of they have multiple licenses at one location, each license is required to meet the requirements of Title 9. That was the whole intent." Again, though, the expert did not testify as to the ultimate legal question whether Bayview was in compliance with those regulations, only that they applied to the facility (something Acadia does not seemingly dispute).

Acadia contends that it was prejudiced by the admission of the expert's testimony since the expert "*misconstrued* the meaning and application of the regulations." It acknowledges that the regulations require that a residential treatment facility have at least one person on site around the clock who is trained in CPR and first aid (Cal. Code Regs., tit. 9, § 10572, subd. (b)) and that state certification standards require that a patient going through acute detoxification be monitored every 30 minutes. Acadia claims the expert was mistaken, though, when he agreed with counsel's statement that certification standards "require that a residential treatment facility that provides detox services have an appropriately trained staff member in the house where a detox client or clients may be housed 24/7 to provide the services necessary to meet their needs." Acadia apparently contends that this statement was inconsistent with the regulation's actual requirement, but we disagree and do not perceive the testimony to be unduly prejudicial. We similarly disagree with Acadia's argument about the significance of the jury's request for readback of testimony on definitions contained in the regulations. The

company claims that the readback "included [the expert's] erroneous interpretation of the regulations and legal conclusions." But, as described above, the read-back included only a description of definitions contained in the regulations.

The cases upon which Acadia relies do not compel reversal. In *Rocklin*, *supra*, 86 Cal.App.5th 713, the parties disagreed whether the defendant theme park developer was able to bring a special motion to strike (Code Civ. Proc., § 425.16), which turned on whether the theme park in question was an "artistic work" (§ 425.17, subd. (d)(2)) and thus not subject to the commercial-speech exemption to the anti-SLAPP statute (§ 425.17, subd. (c)). (*Rocklin* at pp. 719, 722–723.) The defendant submitted a declaration opining both that (1) theme parks generally should be included in the definition of art and that (2) defendant's adventure park specifically was an artistic work. (*Id.* at p. 723.) As to whether theme parks generally could be considered artistic work, the trial court did "not 'consider such an opinion as binding' as such an opinion [was] an inadmissible legal conclusion." (*Id.* at p. 724.) And the court struck the paragraphs asserting that the specific theme park was an artistic work. (*Id.* at pp. 723, 729.) The appellate court agreed with both conclusions and stated that "the trial court merely carried out its duty to interpret the statute and made its determination as a matter of law as to whether a theme park can qualify as an artistic work." (*Id.* at p. 729.) By contrast, Acadia does not specify a legal question that was for the trial court to decide, and which instead was covered by the expert. Moreover, *Rocklin* stressed that " '[a]n appellate court's ruling that a trial court did not abuse its discretion in *admitting* a certain type of evidence is not authority for the proposition that it is an abuse of discretion to *exclude* similar evidence in another case.' " (*Id.* at p. 730.) Here, the opposite is true. Just because it

was not an abuse of discretion to *exclude* expert opinion in *Rocklin* does not mean it was an abuse of discretion to *admit* it here.

Likewise in *Elder v. Pacific Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650, upon which Acadia also relies, the court devoted a single paragraph to the exclusion of an architect's opinion about the applicability to the defendants of certain construction-safety orders regarding demolition work. (*Id.* at p. 664.) The court concluded, without further analysis, that an expert "may not state interpretations of the law, whether it be of a statute, ordinance or safety regulation promulgated pursuant to a statute." (*Ibid.*) The fact that such evidence was deemed to have been properly excluded does not compel us to conclude that it was an abuse of discretion to admit the expert's testimony in this case.

Finally, Acadia relies on *Downer v. Bramet* (1984) 152 Cal.App.3d 837, 841, where the trial court denied a former spouse's request that two different attorneys be permitted to provide expert testimony on whether a transfer of property was deferred compensation and thus community property, the ultimate issue for the jury to decide. *Downer* concluded that there was no abuse of discretion to exclude "opinions as to the application of the law to particular facts" since that would have "usurp[ed] the duty of the trial court to instruct the jury on the law as applicable to the facts." (*Id.* at p. 842.) Again, though, Acadia does not identify where Sandoval's expert improperly testified as to the application of the law to particular facts. *Downer* stressed that "[t]he determination of whether particular expert testimony will assist the jury or, instead, confuse it, is largely within the discretion of the trial court" (*ibid.*), and we find no abuse of that discretion here. In light of that conclusion, we need not address Acadia's argument that it was prejudiced by the alleged error.

*D. Substantial Evidence Supports the Jury's Verdict, Including Its Allocation of Fault.*

Having concluded that the trial court did not err in permitting trial to proceed against the identified corporate entity or in admitting the challenged evidence, we next address, and reject, Acadia's argument that insufficient evidence supports the jury's verdict.

"Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by [California] court[s]." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) Reviewing the verdict under this standard, we conclude that it is supported by substantial evidence.

The jury was instructed that in order for Sandoval to prevail on a negligence cause of action, she had to prove that (1) Acadia was negligent, (2) Pinto was harmed, and (3) Acadia's negligence was a substantial factor in causing Pinto's harm. Negligence was defined as "the failure to use reasonable care to prevent harm to oneself or to others. A person can be negligent by acting or failing to act. A person is negligent if he or she does something that a reasonably careful person would not do in the same situation, or fails to do something that a reasonably careful person would do in the same situation. You must decide how a reasonably careful person would have acted in Acadia Healthcare Company, Inc.'s situation. [¶] In considering the evidence and reaching your decision you may not find that

34

any act or omission by a licensed healthcare provider, including, but not limited to [the onsite nurse] and [the psychiatric technician who had monitored Pinto the night before] was negligent."

Sandoval's attorneys repeatedly stressed that they did not intend to argue that any individual on duty the day of Pinto's fall was negligent. Instead, their theory of the case was that Acadia failed to provide the necessary level of service, including enough appropriately trained staff, to safely guide Pinto through detoxification. During closing argument, Sandoval's counsel said the jury's job was to determine whether "it was reasonable to have one staff member on duty . . . responsible for monitoring six folks in detox spread over four houses as well as passing out medications to the other non-detox folks, if that was reasonable . . . staffing."

On appeal, Acadia argues that Sandoval's "concession" that the medical staff was not negligent defeats her negligence cause of action since Bayside "acted *solely* through the healthcare professionals who cared for Mr. Pinto." The company claims that if the people providing care did not breach the standard of care, it cannot be liable as a matter of law on a number of theories. This argument simply ignores the theory that Sandoval pursued below. The company itself had a direct duty to ensure Pinto's safety. (E.g., *Cochrum v. Costa Victoria Healthcare, LLC* (2018) 25 Cal.App.5th 1034, 1036–1037, 1042, 1053 (*Cochrum*) [skilled nursing facility found negligent based on theory of inadequate staffing the day client choked to death on food given to him inconsistent with his physical condition].)

The cases Acadia cites are wholly inapposite, since they addressed the issue of whether, when an employer *admits vicarious liability* for an employee's *negligent driving in the course of employment*, a plaintiff may still pursue a claim for negligent entrustment. (*Diaz v. Carcamo* (2011)

35

51 Cal.4th 1148, 1161 [admission of vicarious liability bars pursuing claim under alternate theory of negligent entrustment]; *Jeld-Wen, Inc. v. Superior Court* (2005) 131 Cal.App.4th 853, 870 [same].)  Since driving obviously played no role in this case, Sandoval had no reason to elect between these two theories of negligence as there was no occasion for Acadia to admit vicarious liability to avoid evidence of negligent entrustment of a vehicle.

Substantial evidence supports the negligence verdict under the theory that was presented to the jury.  It was undisputed that one of the two people responsible for monitoring people going through detox did not show up to work on the day of Pinto's fall.  It may be true, as Acadia argues on appeal, that Acadia was not negligent in initially placing Pinto in the Canyon View house.  But the fact that the onsite nurse was left with the responsibility to monitor both sides of the campus was sufficient evidence of insufficient staffing to comply with regulations requiring trained staff to be available to meet detox clients' needs.  It is simply not true, as Acadia contends, that because Pinto was observed every 30 minutes as required, "his placement in Canyon View could not have caused the accident."  Just because Pinto was observed at the *minimum required interval* does not mean that the jury was precluded from finding that additional staff presence on the day of the accident would have helped to avoid the accident or to respond to it more quickly.  The onsite nurse testified she would have spent "a lot more time"

with Pinto had she not been responsible for both sides of the campus.[8]  This testimony undercuts Acadia's appellate claim that "any claim of understaffing is irrelevant" and that "[m]ore staff working elsewhere at the facility would not have impacted Mr. Pinto's care."

Substantial evidence also supports the jury's allocation of fault.  (See *Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 147 [jury's apportionment of fault reviewed for substantial evidence].)  Acadia claims that Pinto's "disregard of the nursing staff's repeated medical orders directly caused his injury" and thus allocating 1 percent fault to him for the accident was "the product of juror passion and prejudice that is not supported by the record."  The company points to evidence that the nurse on duty "specifically ordered Mr. Pinto to remain in his room confined to bed" but that he "ignored these medical orders and went outside and up a flight of stairs to smoke a cigarette."  There was overwhelming evidence that Pinto was experiencing severe physical effects from detoxification, was also under the influence of a sedative, and struck the onsite nurse as "the kind of man that was always on the go" and "not this lazy guy that just wanted to sleep all day."  In other words, there was plenty of evidence that he was in an impaired state and

---

[8] At oral argument, Acadia's counsel posited that this court overstated the significance of this testimony in its tentative opinion.  The nurse was asked, "[P]resumably, if you have a level 1, as you did in this case, Mr. Pinto in Canyon View, you likely would have been spending a lot more time in Canyon View to keep tabs on him, correct?"  The nurse responded, "Correct.  I would have been back and forth to the nurses' station and to Canyon View to do my rounds."  In other words, she would have remained on one side of the Bayside campus, where she would have had more of an opportunity to see Pinto if he left his residence.  We disagree that this evidence meant that the jury could not find negligence because there was only a "mere possibility" that understaffing played a role in Pinto's accident, as counsel stated during oral argument.

would have benefitted from closer monitoring. This case is wholly inapposite to *Scott*, upon which Acadia relies, where a grandmother who placed her granddaughter in a tub of scalding water until her flesh burned to the bone was found only 1 percent at fault whereas the governmental agencies supervising the granddaughter's foster care 99 percent at fault, especially considering it was reasonably likely that language in the special-verdict form *misled the jury about how to allocate fault.* (*Id.* at pp. 133, 148, 153.) Here, by contrast, there was ample evidence to support the fault allocation, and there is no suggestion of any errors with the jury instructions or verdict forms on fault allocation. Substantial evidence supports the entire verdict.

### E. Acadia Is Not Entitled to Reduction of the Award of Noneconomic Damages.

Finally, Acadia continues its mischaracterization of the theory upon which the case was tried in arguing that noneconomic damages should be reduced to $250,000 under the Medical Injury Compensation Reform Act of 1975 (MICRA). The argument lacks merit.

"MICRA 'was enacted in 1975 in response to what the Legislature perceived as a medical malpractice insurance crisis that threatened the quality of health care in the state. [Citations.] MICRA includes a variety of provisions calculated to reduce the costs of medical malpractice insurance by limiting the amount and timing of recovery *in cases of professional negligence.*' " (*Cochrum, supra,* 25 Cal.App.5th at p. 1051, italics added.) The provision at issue here, former Civil Code section 3333.2, provides that in any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic

38

losses (*id.*, subd. (a)), but in no action shall the amount of damages for those noneconomic losses exceed $250,000 (*id.*, subd. (b)).[9]

Acadia claims that if "the court determines that the record supports recovery against Acadia based on the professional negligence of the Bayside Marin nursing staff who had sole responsibility for caring for Mr. Pinto . . . , it should, at a minimum, reduce the noneconomic damages" under MICRA. Again, the case was not tried as one for professional negligence of the nursing staff but instead as one in direct negligence against Acadia. Acadia argues that "MICRA applies to Acadia because the jury necessarily found it liable for the conduct of the licensed nurses employed by Bayside Marin," that there was "no basis for finding Acadia directly liable for Mr. Pinto's death due to its own negligence, since Mr. Pinto admittedly received all services required by the standard of care," and that "Sandoval contend[ed] that Bayside Marin's nursing staff failed to adequately monitor and supervise Mr. Pinto." We are perplexed by Acadia's repeated false characterization of the case against it. It is simply beside the point whether, as Acadia argues, the nurses who cared

---

[9] This cap was lifted to $500,000 in wrongful death actions filed on or after January 1, 2023. (Civ. Code, § 3333.2, subds. (c) & (g); see Stats. 2022, ch. 17, § 3.) Because Sandoval filed her action years before the amendment, we consider the previous limit.

for Pinto were considered health care providers, as defined by MICRA.[10] Bayside was not a hospital or medical facility (as the admission documents Pinto signed explicitly stated), and Acadia does not claim otherwise on appeal. There is no basis to reduce Sandoval's noneconomic damages.

## III.
### DISPOSITION

The judgment is affirmed. Sandoval is awarded her appellate costs.

---

[10] The previous version of Civil Code section 3333.2 defined a "health care provider" (*id.*, subd (a)) as "any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code," and "includes the legal representatives of a health care provider." The statute has since been amended to update certain statutory references and to expand the definition to include "the health care provider's employer, professional corporation, partnership, or other form of legally recognized professional practice organization." (Civ. Code, § 3333.2, subd. (j)(1).) Acadia contends that the nurses who cared for Pinto were licensed under Business and Professions Code section 2840 et sequitur.

40

_____
Humes, P. J.

WE CONCUR:


_____
Banke, J.


_____
Smiley, J.


*Sandoval v. Acadia Healthcare Company, Inc.*  A168461

41